152 N.J. Super. 12 (1977)
377 A.2d 745
IN THE MATTER OF BYRAM TOWNSHIP BOARD OF EDUCATION, PETITIONER-APPELLANT AND BYRAM TOWNSHIP EDUCATION ASSOCIATION, RESPONDENT-RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Argued February 23, 1977.
Decided June 16, 1977.
*15 Before Judges MATTHEWS, SEIDMAN and HORN.
Mr. Alten W. Read argued the cause for appellant.
Mr. Robert H. Chanin, of the Washington, D.C. bar, argued the cause for respondent (Messrs. Ruhlman & Butrym, attorneys).
Mr. William J. Zaino argued the cause for amicus curiae New Jersey School Boards Association (Mr. John T. Barbour, on the brief).
*16 Mr. Sidney H. Lehman, General Counsel, argued the cause for Public Employment Relations Commission (Mr. David A. Wallace, formerly General Counsel, and Mr. Don Horowitz, Deputy General Counsel, on the brief).
The opinion of the court was delivered by SEIDMAN, J.A.D.
During the Fall of 1974 the Board of Education of Byram Township (Board) and the Byram Township Education Association undertook to negotiate a teachers' contract for the 1975-1976 school year. More than 60 substantive changes in the existing contract were sought by the Association. When the parties reached an impasse after several negotiating sessions, mediation with the assistance of the Division of Public Employment Relations (N.J.S.A. 34:13A-6) resolved a number of the issues. Fact-finding procedures produced an agreement for a contract term of two years. To resolve the remaining disputed issues, the Board filed with the Public Employment Relations Commission (PERC) a "Petition for Scope of Negotiations Determination" pursuant to N.J.S.A. 34:13A-5.4(d). The parties stipulated and agreed therein to request PERC to determine whether the following matters were mandatory subjects of collective negotiations under the New Jersey Employer-Employee Relations Act (N.J.S.A. 34:13A-1 et seq.):
(a) Duty-free lunch period and assignment of non-teaching duties;
(b) Teacher load and pupil contact time;
(c) Teacher assignments, and
(d) Teacher and classroom facilities.
After a hearing PERC issued a decision and order, the contents of which will be discussed later in more detail. It declared a number of the subjects to be mandatorily negotiable and ordered the Board to negotiate thereon in good faith. The others were determined to relate predominately to the means and methods of providing education to the students of the district and thus not to be subject to mandatory *17 negotiation. However, PERC stated that they were "permissive" subjects of negotiation and the Board was ordered "to refrain from insisting, to the point of impasse, upon the inclusion of such matters in a collective negotiations agreement * * *."
The Board of Education appealed the decision and order, maintaining that the issues contained in the stipulation were managerial prerogatives and therefore not proper subjects of collective negotiations. Since the Association did not file a cross-appeal, and the Board was clearly not aggrieved by PERC's rulings favorable to it, this appeal is necessarily limited to those subjects determined by PERC to be mandatorily negotiable.
The New Jersey Employer-Employee Relations Act, N.J.S.A. 34:13A-1 et seq., as amended by L. 1974, c. 123, gave PERC jurisdiction to hear and decide unfair labor charges and issue appropriate remedial orders respecting them  see Patrolman's Benev. Ass'n v. Montclair, 70 N.J. 130, 136 (1976)  and also to make determinations respecting the scope of collective negotiations. The latter authority is embodied in N.J.S.A. 34:13A-5.4(d), which provides as follows:
The commission shall at all times have the power and duty, upon the request of any public employer or majority representative, to make a determination as to whether a matter in dispute is within the scope of collective negotiations. The commission shall serve the parties with its findings of fact and conclusions of law. Any determination made by the commission pursuant to this subjection may be appealed to the Appellate Division of the Superior Court.
PERC conceived its mission in a scope of negotiations proceeding to be a determination of "whether the disputed matter is a required, permissive, or illegal subject for collective negotiations * * *." N.J.A.C. 19:13.3-7. The conclusion here that several of the disputed matters, though not mandatory, were permissive subjects for collective negotiations has provoked a vigorous dissent from amicus curiae New *18 Jersey School Boards Association. It maintains that matters are either negotiable or nonnegotiable, and there is no justification, statutory or by judicial interpretation, for PERC's establishment of a "tripartite breakdown for the scope of negotiations." The Board of Education takes no position on the matter, but the teachers' association suggests that the challenge need not be dealt with on the merits, since the matter is not properly before us on this appeal. We agree.
The subject-matter of permissive negotiation is not germane to the Board's appeal, which requires only a resolution of whether certain matters were correctly determined by PERC to be mandatorily negotiable. We therefore decline to consider at this time whether nonmandatory subjects may be negotiated on a permissive basis, or whether the issue is within the jurisdiction of PERC in a scope of negotiation proceedings. An amicus curiae must accept the case before the court with the issues made by the parties. 4 Am. Jur.2d, Amicus Curiae, § 3 at 111 (1962). We doubt that it may raise an issue not raised by them. See Endress v. Brookdale Community College, 144 N.J. Super. 109, 123 (App. Div. 1976). In any event, we prefer that the difficult and possibly controversial implications of permissive negotiations should await a case in which the issue is squarely presented.
We turn now to a consideration of the applicable standard for measuring the scope of mandatory collective negotiations under the New Jersey Employer-Employee Relations Act. Speaking broadly, such negotiations encompass terms and conditions of employment. In Dunellen Bd. of Ed. v. Dunellen Ed. Ass'n, 64 N.J. 17, 24 (1973), the court noted that the Legislature did not define the phrase "terms and conditions" as used in the act, "nor did it specify what subjects were negotiable and what subjects were outside the sphere of negotiation." The court expressed the view (at 24-25) that since there was an explicit provision in the act (N.J.S.A. 34:13A-8.1) that nothing in it shall "annul or modify any statute or statutes of this State," it was "our *19 clear judicial responsibility to give continuing effect to the provisions in our Education Law (Title 18A) without, however, frustrating the goals or terms of the [act]." The court said further:
Surely the Legislature, in adopting the very general terms of L. 1968, c. 303, did not contemplate that the local boards of education would or could abdicate their management responsibilities for the local educational policies or that the State educational authorities would or could abdicate their management responsibilities for the State educational policies * * * On the other hand it did contemplate that to the extent that it could fairly be accomplished without any significant interference with management's educational responsibilities, the local boards of education would have the statutory responsibility of negotiating in good faith with representatives of their employees with respect to those matters which intimately and directly affect the work and welfare of their employees.
The lines between the negotiable and the non-negotiable will often be shadowy and the legislative reference to "terms and conditions of employment" without further definition hardly furnishes any dispositive guideline. [at 25]

* * * * * * * *
Thus far our Legislature has not chosen to set forth the individual subjects which are to be negotiable and has left the matter of the judiciary for case by case determination as to what are terms and conditions of employment within the meaning of N.J.S.A. 34:13A-5.3. But it has at the same time clearly precluded any expansive approach here by directing unequivocally that provisions in existing statutes such as our educational laws shall not be deemed annulled or modified. N.J.S.A. 34:13A-8.1. [at 31]
Although the Dunellen court envisaged, in the absence of further legislative clarification, that the judiciary would determine the meaning of the phrase on a case-by-case basis, the Legislature assigned to PERC the task of determining, when requested to do so by any public employer or majority representative, whether a matter in dispute was within the scope of collective negotiations. N.J.S.A. 34:13A-5.4. An administrative procedure was thereby established for the resolution of scope questions, with primary jurisdiction over the subject matter vested in PERC. Plainfield Bd. of Ed. v. Plainfield Ed. Ass'n, 144 N.J. Super. 521, 525 (App. Div. 1976). See also, In re Hoboken Teachers' Ass'n, 147 N.J. Super. 240 (App. Div. 1977).
*20 The 1974 amendments to the act (L. 1974, c. 123) did not define "terms and conditions" more specifically. Instead, by a companion statute, L. 1974, c. 124, the Legislature created the Public Employer-Employee Relations Study Commission and charged it with the responsibility of considering proposed changes in the act and addressing itself to the question, among others, of
* * * [w]hether or not it is necessary and desirable either to define the phrase "terms and conditions of employment" * * * and, in so doing, specify what subjects are mandatory, voluntary, or illegal within the scope of bargaining or of grievance arbitration, or to require that procedural guidelines be established for determining same.
The Commission completed its assignment and submitted a report to the Governor and the Legislature on February 2, 1976, in which, among many other things, it recommended that PERC "continue to determine the scope of `terms and conditions of employment' for the parties on a case by case basis." Public Employer-Employee Relations Study Commission, Report to the Governor and the Legislature (1976), at 55. There has been no further legislative enactment on this matter.
PERC has applied in this case a standard for determining issues of negotiability which it adopted in a recent scope of negotiations case, In re Rutgers, The State University, P.E.R.C. No. 76-13, 2 NJPER 13 (1976): Where the activities of employers "concern terms and conditions of employment," they are subject to the duty to negotiate; but where the activities relate "to managerial and/or educational decisions and are not themselves terms or conditions of employment," they are not negotiable except to the extent that these matters may have an effect or impact upon the employees' terms and conditions of employment, in which case the employer is required to negotiate "regarding that impact as it relates to terms and conditions of employment."
*21 The Board of Education takes no position on this matter, choosing instead to argue on appeal that the disputed subjects dealt with nonnegotiable managerial prerogatives, the impact of which on terms and conditions of work was either nonexistent or minimal. The assault upon the "impact" concept is launched by the amicus curiae. It contends that there is no basis for a holding that the impact of nonmandatory matters for collective negotiations is in and of itself a mandatory matter for collective negotiations. The thrust of its argument, purportedly rooted in Dunellen, is that before the obligation to negotiate on a specific matter can arise, it must first be determined that the negotiations can fairly be accomplished without any significant interference with management's educational responsibilities, and, if it can, then the matter must further be one which "intimately and directly" affects the work and welfare of the employees. This concept is too restrictive.
We do not believe, as does the Association, that the 1974 amendments rendered obsolete the Dunellen trilogy (Dunellen Bd. of Ed. v. Dunellen Ed. Ass'n, supra; Englewood Bd. of Ed. v. Englewood Teachers, 64 N.J. 1 (1973); Burlington Cty. College Fac. Ass'n v. Bd. of Trustees, 64 N.J. 10 (1973)). The amendments, in our view, do not reflect a legislative design to deprive boards of education of their exclusive managerial prerogative in matters involving predominantly educational policies. See Union Cty. Bd. of Ed. v. Union Cty. Teach. Ass'n, 145 N.J. Super. 435, 437 (App. Div. 1976); North Bergen Tp. Bd. of Ed. v. North Bergen Fed. Teachers, 141 N.J. Super. 97, 103 (App. Div. 1976); Clifton Teachers v. Clifton Bd. of Ed., 136 N.J. Super. 336, 339 (App. Div. 1975); cf. Patrolmen's Benev. Ass'n v. Elizabeth, 146 N.J. Super. 257, 261 (App. Div. 1976); and see, Red Bank Bd. of Ed. v. Warrington, 138 N.J. Super. 564, 571 (App. Div. 1976). We do not think that the Legislature intended such result by deleting from N.J.S.A. 34:13A-8.1 the provision that nothing in the act should be construed to annul or modify "any *22 statute or statutes of this State", and substituting the words "nor shall any provision hereof annual or modify any pension statute or statutes of this State". Whether or to what extent the change in wording may affect specific provisions in Title 18A which appear to be in conflict with the New Jersey Employer-Employee Relations act is a complex issue which need not be resolved in this appeal and should be left for another day. But see Red Bank Bd. of Ed. v. Warrington supra, and cf. Patrolmen's Benev. Ass'n v. Elizabeth, supra.
Since the phrase "terms and conditions" remains undefined in the statute, the Dunellen standard, in our view, retains its fundamental vitality. It is not yet evident to us that the standard evolved by PERC is necessarily inconsistent with the Dunellen standard or with the court's understanding of the legislative intent to be that local boards of education would be required to negotiate in good faith "with respect to those matters which intimately and directly affect the work and welfare of their employees", to the extent that "it could fairly be accomplished without any significant interference with management's educational responsibilities," 64 N.J. at 25. There is no reason to suppose that PERC is unaware of these broad guidelines or of its obligation to follow pertinent judicial pronouncements on the subject.
It would be foolhardy for us here to try to draw a precise line of demarcation between items which are predominantly educational policies and those which are not; or between matters which "intimately and directly" affect the financial and personal welfare of the teachers and those whose effect may be only indirect and remote. Similarly, it would be futile to endeavor to fix the exact point at which negotiations would significantly interfere with management's educational responsibilities. Where particular matters have been resolved by developing case law, we would expect PERC to be guided accordingly. As to the multitude of unresolved *23 matters which will surely come before PERC, "it is particularly important in the early phases of the development of experience in this relatively new area of the administrative process that a broad and flexible latitude of interpretation of the statute be accorded the agency charged with its implementation." State v. Prof. Ass'n of N.J., Dept. of Ed., 64 N.J. 231, 259 (1974). See also, Plainfield Bd. of Ed. v. Plainfield Ed. Ass'n, supra, 144 N.J. Super. at 524. PERC's determinations will, of course, be subject to judicial review. In the course of time, through the efforts of PERC and the courts, a useful body of law will develop, which, hopefully, will forestall disputes between boards of education and teachers' associations over the scope of negotiability and thereby facilitate the collective negotiation of agreements concerning the terms and conditions of employment.
The petition filed by the Board of Education in this case was within the purview of N.J.S.A. 34:13A-5.4(d), as implemented procedurally by N.J.A.C. 19:13-1.1 et seq. The facts were not in dispute. The issue presented to PERC was simply whether the stipulated matters were mandatory subjects of collective negotiations. PERC made a determination and, as required by the statute, served upon the parties findings of fact and conclusion of law. These are now before us for review.
The scope of our appellate function is clearly set forth in State v. Prof. Ass'n of N.J., Dept. of Ed., supra:
The role of judicial review in that regard is thoroughly settled. The administrative determination will stand unless it is clearly demonstrated to be arbitrary or capricious. Flanagan v. Civil Service Dept., 29 N.J. 1, 12 (1959). This is the same rule as applies to judicial review of bargaining unit determinations by the National Labor Relations Board. Packard Motor Co. v. National Labor Relations Board, supra (330 U.S. 485, 67 S.Ct. 789, 91 L.Ed. 1040). Moreover, where, as here, a substantial element of agency expertise is implicated, due weight should be accorded thereto on judicial *24 review. Close v. Kordulak Bros., 44 N.J. 589, 599 (1965).[1] [64 N.J. at 258-259]
Within this framework we deal with the matters submitted to and determined by PERC which constitute the subject of this appeal. As indicated earlier, there being no cross-appeal we do not intend to discuss any matter which PERC adjudged to be a non-mandatory subject for negotiation.
1. Duty-free lunch period and assignment of non-teaching duties.
a. Elimination of the exception for emergencies from the duty-free lunch period. The existing contract provided that teachers would have a 45-minute duty-free lunch period, except when inclement weather, ground conditions or emergencies compelled teachers to provide coverage during their lunch periods. The teachers proposed the removal of the exception so that they would not be called upon to supervise students during their own lunch period. PERC ruled that as this proposal related solely to a duty-free lunch period it was clearly a term and condition of employment and as such was a required subject for collective negotiation.
We think that PERC misconceived the import of the proposal. As we view it, it was not concerned solely with a duty-free lunch period. Rather, the proposal sought the deletion of the exception in the case of emergent situations. It cannot be denied that the safety and well-being of the *25 student body and the correlative maintenance of order and efficiency are matters of major educational policy which are management's exclusive prerogative. For a board of education to relinquish its right and duty to assign teachers to supervisory tasks in exceptional cases, despite a resulting impingement upon their otherwise duty-free lunch period, would be an abdication of its responsibility in that regard. We therefore hold that the elimination of the exception in question was not a subject of mandatory negotiation, and that PERC erred in concluding that it was.
b. Teachers' work day. The teachers proposed a contractual provision that they be required to report no earlier than 20 minutes prior to the start of the students' day and be permitted to leave no later than five minutes after the end of the students' school day. PERC found that the proposal related to the length of the teachers' work day and not to the length of the students' school day and was therefore "obviously a term and condition of employment and, as such, is mandatorily negotiable." We agree. See Englewood Bd. of Ed. v. Englewood Teachers, supra, 64 N.J. at 6-7; and cf. West Orange Bd. of Ed. v. West Orange Ed. Ass'n, 128 N.J. Super. 281 (Ch. Div. 1974). The proposal did not implicate any statute or regulation fixing minimum hours of employment. See, e.g., N.J.A.C. 6:3-1.13.
c. Performance of certain nonteaching duties. The portions of the teachers' proposal involved here (others were declared not to be required subjects for negotiation) were that they should not be required to move classroom equipment, furniture or supplies when assigned to a new teaching station, or to perform certain custodial functions, such as cleaning venetian blinds, washing windows and the like. The Board does not appear seriously to contest PERC's determination that as these matters "do not relate to student safety, security and control, [they] constitute mandatorily negotiable terms and conditions of employment within the meaning of the Act," a conclusion with which we are heartily in accord. It is self-evident *26 that those duties, many of which would normally be assigned to maintenance personnel, would intimately and directly affect the work and welfare of the teachers.
2. Teacher load and pupil contact time. The proposals were that (1) teachers in departmental areas should not teach more than five teaching periods or more than five hours a day, (2) intermediate and lower elementary teaching time should not exceed five hours of pupil contact, (3) departmental area teachers should not have more than two subject area preparations, and (4) special area teachers should not have more than three hours of pupil contact a day. PERC held that each of these proposals dealt with the work load of the teachers and all were mandatorily negotiable. The Board objects that the demands would place severe limits upon it as to the number of teaching periods, their length and the length of "pupil contact" imposed upon the teachers.
Work hours and work loads clearly relate to terms and conditions of employment and thus are mandatorily negotiable. Englewood Bd. of Ed. v. Englewood Teachers, supra; Burlington Cty. College Fac. Ass'n v. Bd. of Trustees, supra; Red Bank Bd. of Ed. v. Warrington, supra. We agree with the result reached by PERC, provided, however, that with respect to special area teachers, the proposal is not to be construed as reducing the total daily employment time of such teachers below four clock hours, the minimum required by N.J.A.C. 6:3-1.13 for full employment of teachers.
3. Posting of notice of vacancies for certain positions, and criteria for filling vacancies. The existing contract called for the posting of all openings in summer school, home teaching and federal programs at least one month in advance. The suggested change was to add "or as soon as the position becomes available." We readily agree with PERC that the posting of such notices as proposed was a matter on which the Board must negotiate. Cf. North Bergen Tp. Bd. of Ed. v. North Bergen Fed. Teachers, supra, 141 N.J. Super. at 104.
*27 The teachers further proposed that in filling such vacancies consideration should be given to a teacher's area of competence, major and/or minor field of study, quality of teaching performance, attendance record and length of service in the school district; that, all other factors being substantially equal, preference should be given to teachers who had taught the grade or subject on a regular basis at any time during the preceding three years, and that teachers employed in the school district should have priority over outside applicants.
In North Bergen Tp. Bd. of Ed. v. North Bergen Fed. Teachers, supra, we held that the determination of the ultimate criteria for promotion, and the right to select candidates therefor from either within or without the system must be left to the board of education as matters of major educational policy. We added, however, that procedures by which promotional vacancies are filled should be negotiated. Here, PERC sought to distinguish the cited case by construing the proposals as procedures to be followed in filling the vacancies, and, as such, terms and conditions of employment which were mandatorily negotiable. We find the distinction nebulous, as it applies to this case. It seems to us that such matters as a teacher's area of competence, quality of teaching performance, attendance record and length of service are directly concerned with qualifications for the vacancy and have little, if any, bearing on procedures to be followed in filling the vacancy. As for the matter of preference, what we said on the subject in North Bergen Tp. Bd. of Ed. v. North Bergen Fed. Teachers, supra, is applicable here.
We conclude, therefore, that, except for the posting of vacancy notices, the remainder of the proposals under this heading are matters of major educational policy on which the board may not be compelled to negotiate.
4. Facilities for teachers. The existing contract made provision for a faculty lounge in each school, an appropriate work area and facilities for teachers who worked in *28 more than one building, adequate space for teacher storage of educational materials, and a serviceable desk and chair for the exclusive use of each teacher. The Association proposed to add the following: (1) an appropriate furnished, air-conditioned teacher work area, with adequate equipment and supplies for the preparation of instructional materials and for use as a faculty lounge; (2) a private pay telephone in each faculty lounge for the exclusive use of teachers; (3) well-lighted and clean restrooms in each school, separate for each sex and apart from those used by students; (4) installation of full-length mirror and a shelf in one specified faculty rest room; (5) free and adequate off-street parking facilities, protected against vandalism and properly maintained; (6) a set of keys for all desks, closets and doors in a teacher's station, and (7) the construction of a fire escape for a room at one of the schools. These were all determined by PERC to be mandatorily negotiable. Other proposals, which were declared not to fall within that category, are, for reasons previously stated, beyond the scope of this appeal and require no discussion.
PERC expressed the view that the proposals it deemed to be mandatorily negotiable all related to terms and conditions of employment. As to the cost factors, PERC added that the employer must consider "not only the priorities of the various economic proposals of the Association but also the overall economic context including proposals of any other groups of employees, repairs, maintenance, new programs, and other areas having costs associated with them."
The Board of Education resists these proposals, maintaining that it has been vested by statute with the authority to furnish suitable educational facilities, including school buildings, furniture and equipment (N.J.S.A. 18A:33-1); to purchase and condemn land for school purposes after approval by the voters of the district (N.J.S.A. 18A:20-4.2), and to erect, improve, enlarge, repair or furnish school buildings, and to borrow money for that purpose (N.J.S.A. 18A:20-4.2). The Board also points to the need for approval *29 of the Commissioner of Education or the State Board of Education in certain cases.
It is beyond our comprehension why negotiating the installation of such relatively minor things as a pay telephone, a full-length mirror, or a shelf for the convenience of the teachers should meet with such determined opposition by the Board; or, indeed, why it should even be necessary to negotiate them at all as part of a teachers' contract. It seems to us that a simple request for the facility, the cost of which would undoubtedly be minimal, should have sufficed. In any event, they were clearly subjects for mandatory negotiation.
As for the others, all of which, we are satisfied, related to terms and conditions of employment, the record below does not reveal that any would constitute a capital improvement involving a major budgetary expense, or would significantly interfere with management's educational responsibilities. The Board did not seek to establish below by relevant proofs or to demonstrate in any other manner that the proposals, if otherwise acceptable to it, could not be implemented effectively by the utilization of existing facilities or the expenditure of available moneys from already budgeted funds. Its counsel argued to PERC that "it's the principle of the thing that I'm really talking about, it's the basic principle of the thing, namely, do we have the obligation to negotiate these types of things?" The fear was voiced that "once we deal with the faculty room. that opens up the door, that gives us the right, somebody can say, well, we did it with the faculty room last year, we're now going to deal with classrooms this year and something else."
We do not regard the Board's objections as valid. Apart from limitations respecting capital expenditures, if the subject-matter otherwise intimately and directly affects the work and welfare of the teachers and will not significantly interfere with management's educational responsibilities, the Board should be required to negotiate it without any concern over whether doing so might hypothetically embolden the teachers to attempt to encroach at some future *30 time into non-negotiable areas. Furthermore, as PERC observed sensibly and accurately,
* * * [i]t is necessary to distinguish between the wisdom of agreeing to a particular proposal relating to a term or condition of employment and whether that proposal relates to a term and condition of employment. The fact that it would not be responsible or prudent to accept a proposal does not by itself render the proposal something other than a term and condition of employment and therefore nonnegotiable. The task confronting us is to decide whether the disputed matters are terms and conditions of employment, not whether the Board should accede to the Association's proposals.
We do not find PERC's determination of the matter of teachers' facilities to be arbitrary or capricious.
In summary, except with respect to the subjects which we have concluded, contrary to PERC's determination, are not mandatorily negotiable, and apart from those matters contained therein on which we have elected to express no opinion at this time, we concur in PERC's Decision and Order.
Accordingly, as modified and subject to the foregoing reservation, we affirm the Decision and Order under review.
NOTES
[1] N.J.S.A. 34:13A-5.4 provides, in part, that in enforcement proceedings by PERC in matters of unfair practices or scope of negotiations its "findings of fact, if based upon substantial evidence on the record as a whole, shall not, in such action, be set aside or modified; any order for remedial or affirmative action, if reasonably designed to effectuate the purposes of this act, shall be affirmed and enforced in such proceeding." Since the review standard contained in this section is essentially the same as that which the courts have traditionally observed, we pass the question of whether the Legislature may constitutionally impose upon the courts any standard governing the review of matters within their inherent jurisdiction.