202

In the Matter of the Arbitration between SARATOGA SPRINGS CITY SCHOOL DISTRICT, Petitioner, and NEW YORK STATE PUBLIC EMPLOYMENT RELATIONS BOARD et al., Respondents.

Third Department, May 17, 1979

## APPEARANCES OF COUNSEL

*Caffry, Pontiff, Stewart, Rhodes & Judge (J. Lawrence Pal- trowitz* of counsel), for petitioner.

*Martin L. Barr (Richard A. Curreri* of counsel), for Public Employment Relations Board, respondent.

*Roemer & Featherstonhaugh (Richard L. Burstein* of coun- sel), for Saratoga County Educational Chapter, Civil Service Employees Association, respondent.

## OPINION OF THE COURT

STALEY, JR., J.

Petitioner and Saratoga County Educational Chapter, Civil Service Employees Association, Inc. (CSEA) were parties to a collective bargaining agreement for the period effective July 1, 1976 to June 30, 1978, affecting 55 bus drivers, 5 mechanics and a head mechanic, all of whom were employed by pe- titioner to operate and maintain school buses owned by pe- titioner. Prior to the commencement of negotiations for this contract, petitioner had considered contracting out its trans- portation services to a private firm, but ultimately decided not to subcontract. During the negotiations for the contract which commenced on June 28, 1976, the issue of subcontracting for transportation services was, therefore, not raised, and the contract contains no reference to subcontracting.

After the 1976-1978 contract had been executed, John Le

Roux, the Assistant Superintendent for Business of the petitioner, contacted Upstate Transport Consortium, Inc. (UTC) for information on a relatively new program regarding subcontracting of transportation services whereunder petitioner would retain ownership of the buses and garage facilities, but would contract for the maintenance and operation of the buses. By letter dated February 24, 1977, UTC provided detailed information concerning this program including a cost analysis which indicated a reduction in cost and an increase in State aid.

In March, 1977, petitioner began budget preparation for the 1977-1978 school year, and appointed an advisory budget committee consisting of 14 voting members. Two of the members of this committee were members of the local CSEA chapter. At a number of the meetings of this advisory committee, Mr. Le Roux provided information regarding contract transportation. The president of the CSEA local informed Michael A. White, the field representative of CSEA, of the consideration being given to contract transportation.

On March 31, 1977, Mr. White addressed a letter to Mr. Le Roux stating that the CSEA contractual agreement runs to the close of business on June 30, 1978, and the "Saratoga School District must negotiate with CSEA concerning any change in terms and conditions of employment", and that "CSEA could never, and will never, agree to the elimination of more than 25% of the bargaining unit via the contracting of the Transportation Department." This letter also listed several problem areas involved in contract transportation and requested Mr. Le Roux to reconsider his position.

On April 4, 1977, the advisory committee voted to recommend to the Board of Education that petitioner enter into contract transportation for the 1977-1978 school year. The CSEA representatives on the committee voted against this recommendation. On May 4, 1977, the Board of Education solicited bids for a contract to provide the services of mechanics and bus drivers for petitioner. At a meeting of the Board of Education held on June 14, 1977, a motion was made to accept the lowest acceptable bid for contract transportation. John Corcoran, a CSEA Regional Field Supervisor, spoke in opposition to the motion and read a letter which he had sent to all board members wherein it was related that CSEA's efforts to secure information from the district concerning the proposal and question submitted had been "evaded by a refusal to

discuss", and that the school district had failed to fulfill its contractual obligations, as well as those "of the Taylor Law which require 'good faith' bargaining on all terms and conditions of employment." He concluded with a request for a private meeting with the school board to discuss the matter of contract transportation, and that the motion to accept a contract be tabled. This request was granted.

On June 23, 1977, the Superintendent of Schools and the Director of Personnel met with several CSEA representatives at a private meeting to discuss the issue of contract transportation. The CSEA representatives expressed their basis of opposition to such a contract and requested the school district to negotiate on this matter. The Superintendent of Schools reviewed the data regarding the costs of contracting as against district operation, noting that the cost of contracting would be approximately $7,000 more than a district operation, but that the resulting increase in State aid would result in a net savings to the district of $195,000. The Superintendent of Schools also stated that the school district did not have to negotiate because it had a right to contract out since subcontracting was a management prerogative.

At the school board meeting of June 28, 1977, the board, by resolution, accepted the bid of UTC for the operation and maintenance of the buses of the school district. By letter dated June 29, 1977, the transportation employees of the school district were notified that they would not be rehired in September for the 1977-1978 school year. On July 15, 1977, the contract with UTC was executed, and it became effective on July 18, 1977.

On July 11, 1977, CSEA filed an improper practice charge against the school district alleging a violation of section 209-a (subd 1, par [d]) of the Civil Service Law asserting, among other things, that the school district had made a unilateral change in the terms and conditions of employment without negotiations.

After a hearing, the hearing officer determined that the school district had violated section 209-a (subd 1, par [d]) of the Civil Service Law by entering into the contract without first negotiating its decision with CSEA, and recommended that the school district be ordered to (1) offer reinstatement under their prior terms and conditions of employment to those employees terminated as a result of the July 15, 1977 agreement with Upstate Transportation Consortium, Inc., together

with any loss of wages or benefits and (2) negotiate in good faith with CSEA concerning all terms and conditions of employment.

The authority for the first part of the recommended order was stated to be section 205 (subd 5, par [d]) of the Civil Service Law which became effective on July 12, 1977. On appeal, the Public Employment Relations Board (PERB) affirmed the hearing officer's decision and issued the recommended order.

Petitioner contends that the board's determination was affected by an error in law and was arbitrary, capricious and an abuse of discretion in that there is no duty to bargain for a transportation services contract with the possible exception of negotiations solely on the impact of the decision upon the employees. It is also contended that the record failed to support the determination that the school district deliberately refused to negotiate in good faith with CSEA, and that the board exceeded its authority in issuing its remedy.

Public employees have the right to negotiate collectively with their public employers with regard to the terms and conditions of employment (Civil Service Law, §§ 203, 204). "The term 'terms and conditions of employment' means salaries, wages, hours, agency shop fee deduction and other terms and conditions of employment" (Civil Service Law, § 201, subd 4). It is an improper practice for a public employer "to refuse to negotiate in good faith with the duly recognized or certified representatives of its public employees" (Civil Service Law, § 209-a, subd 1).

Subdivision 3 of section 209-a of the Civil Service Law provides: "In applying this section, fundamental distinctions between public and private employment shall be recognized, and no body of federal or state law applicable wholly or in part to private employment, shall be regarded as binding or controlling precedent."

A school district has the power to contract with any person or corporation for the conveyance of pupils residing within the district (Education Law, § 1604, subd 23; §§ 1709, 2021). These sections also authorize a school district to provide its own transportation for the conveyance of pupils residing within the district.

The dispute herein centers on the question of whether a subcontract involving the replacement of unit employees of the school district with employees of a contractor who perform

the same duties under similar standards results in making the matter of subcontracting a mandatory subject of negotiation.

· Petitioner asserts that it has the power to make such a contract, and its decision to enter into such a contract for the purpose of saving taxpayers' dollars is an exercise of governmental prerogative about which there is no duty to negotiate.

■ As a general rule, the good faith creation and abolition of job positions are not terms and conditions of employment and are not proper subjects of a collective bargaining agreement, unless the abolition of positions constitutes a term or condition of employment (Matter of Schwab v Bowen, 80 Misc 2d 763, affd 51 AD2d 574, affd 41 NY2d 907). PERB has, however, been given the authority to determine whether a particular matter is or is not a term or condition of employment and its determination should be accepted if not unreasonable and if not affected by an error of law (Matter of West Irondequoit Teachers Assn. v Helsby, 35 NY2d 46).

There is a substantial difference between the abolition of civil service positions to effectuate a reduction in the work force and the abolition of positions for the purpose of subcontracting for the same services without the reduction of the work force even though both may result in an economic benefit to the taxpayer.

PERB, under its broad discretionary power to determine whether a particular matter is or is not a term or condition of employment, is not precluded by subdivision 3 of section 209-a from considering Federal or State decisions applicable to private employment as a guide in reaching a decision so long as the board considers the fundamental distinctions between public and private employment and does not regard such Federal or State decisions as a binding or controlling precedent. The wealth of experience in the private sector need not be completely disregarded (Fibreboard Corp. v Labor Bd., 379 US 203; Matter of Somers Faculty Assn., 9 PERB 3014; Matter of City School Dist. of New Rochelle, 4 PERB 3060).

PERB, here, considered the test set forth in Unified School Dist. No. 1 of Racine County v Wisconsin Employment Relations Comm. (Decision No. 12055-B) which involved a similar situation, to wit: the subcontracting of the district's food service program to a private corporation, and wherein the commission determined that such subcontracting had a primary impact upon conditions of employment. On appeal to the Supreme Court of Wisconsin, that determination was affirmed

*(Unified School Dist. No. 1 of Racine County v Wisconsin Employment Relations Comm.,* 81 Wis 2d 89).

The court determined the appropriate test to be whether a particular decision is primarily related to wages, hours and conditions of employment, or whether it is primarily related to the formulation or management of public policy. In determining that the primary impact of the decision to subcontract was on conditions of employment, the court said (p 102): "The policies and functions of the district are unaffected by the decision. The decision merely substituted private employees for public employees. The same work will be performed in the same places and in the same manner. The service provided by the district will not be affected. The decision would presumably be felt in only two ways; it is argued that it would result in a financial saving to the district, and the district's food service personnel will have to bargain with ARA for benefits which they enjoyed before the decision, including the loss of some 2,304 accumulated sick-leave days and participation in the Wisconsin Retirement Fund."

This statement by the Wisconsin Supreme Court aptly describes and simulates the situation in this case. It, therefore, appears that the decision of PERB has a reasonable basis and is not arbitrary or capricious or affected by an error of law.

■ Petitioner contends PERB's factual determination that petitioner "had engaged in no negotiations prior to taking action unilaterally", is not supported by substantial evidence. In support of this contention, petitioner submits that the budget committee meetings and the June 23, 1977 private encounter emphatically demonstrate that negotiations took place. The budget committee was appointed by the Board of Education and acted in a strictly advisory capacity regarding all aspects of the 1977-1978 budget. There is nothing in the record to suggest that this committee composed of 14 voting members of which two were CSEA representatives had any negotiating function.

Furthermore, contents of the June 23, 1977 meeting can be construed so as to support PERB's finding that bargaining never occurred. The superintendent stated that petitioner did not have to negotiate since it has the right to contract out, and subcontracting was a "management prerogative". Accordingly, substantial evidence exists to support PERB's conclusion that the advisory committee meetings and the June 23

meeting "were no more than a meaningless prelude to what was intended to be, and in fact was, the effectuation by [the school district] of its predetermined decision to act on its own in the matter. The essential characteristics of the give-and-take of prior negotiation were clearly lacking."

■ Petitioner contends that PERB's order was an improper exercise of its power to remedy improper practices. Section 205 (subd 5, par [d]) of the Civil Service Law empowers PERB to remedy improper practices, including violations of section 209-a of the Civil Service Law. Prior to July 11, 1977, this power, with regard to a refusal to negotiate in good faith, was limited to "the entry of an order directing the public employer * * * to negotiate in good faith" (Civil Service Law, § 205, subd 5, par [d]). This section was amended by chapter 429 of the Laws of 1977, effective July 12, 1977, to empower PERB as of that date "to issue a decision and order directing an offending party to cease and desist from any improper practice, and to take affirmative action as will effectuate the policies of this article (but not to assess exemplary damages), including but not limited to the reinstatement of employees with or without back pay; provided, however, the board shall not have authority to enforce an agreement between an employer and an employee organization and shall not exercise jurisdiction over an alleged violation of such an agreement that would not otherwise constitute an improper employer or employee organization practice."

On April 13, 1978 PERB issued its decision and order herein which ordered the school district to "1. Offer reinstatement under their prior terms and conditions of employment to those employees terminated as a result of the July 15, 1977 agreement with Upstate Transportation Consortium, Inc., together with any loss of wages or benefits that they may have suffered by reason of such agreement".

Petitioner asserts that PERB could not utilize its added power to order reinstatement since the basis of the improper practice charge sworn to July 7, 1977, and filed with the board on July 11, 1977, is that all of the alleged improper conduct occurred prior to the filing by CSEA of the charges on July 11, 1977 and prior to the effective date of the amendment.

PERB asserts that the act upon which its order of reinstatement with back pay is based occurred on July 15, 1977 when the agreement with UTC was executed with the approval of the superintendent of the school district. In this regard, it is

argued that the contract did not become effective and binding until it was reduced to writing, and the superintendent gave his approval on July 15, 1977 as required by subdivision 3 of section 3635 of the Education Law, and that at any time prior to the superintendent giving his approval the school district could have reconsidered its decision not to negotiate and engage in meaningful bargaining with CSEA. Petitioner argues that the controlling date is June 28, 1977, the date on which the Board of Education voted to subcontract with UTC. It could also be argued that the date upon which there was a unilateral change in conditions of employment was June 29, 1977 when the district notified the transportation employees by letter that they would not be rehired for the 1977-1978 school year.

However, the determination which is under review was issued on April 13, 1978. On that date, PERB possessed the power to order reinstatement of employees with lost pay as provided by section 205 (subd 5, par [d]) of the Civil Service Law. PERB properly exercised its remedial power over petitioner's improper practices.

The determination should be confirmed, and the petition dismissed, without costs.

MAHONEY, P. J., GREENBLOTT, KANE and MIKOLL, JJ., concur.

Determination confirmed, and petition dismissed, without costs.