176 N.J. Super. 85 (1980)
422 A.2d 424
IN THE MATTER OF LOCAL 195, IFPTE, AFL-CIO, PETITIONER-RESPONDENT,
v.
STATE OF NEW JERSEY, RESPONDENT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued September 16, 1980.
Decided October 6, 1980.
*88 Before Judges MATTHEWS, MORGAN and MORTON I. GREENBERG.
Erminie L. Conley, Assistant Attorney General, argued the cause for appellant (John J. Degnan, Attorney General, attorney; Erminie L. Conley of counsel and on the brief).
Sanford R. Oxfeld argued the cause for respondent Local 195, IFPTE, AFL-CIO (Rothbard, Harris & Oxfeld, attorneys).
Don Horowitz, Deputy General Counsel, argued the cause for Public Employment Relations Commission (Sidney H. Lehmann, General Counsel, attorney).
The opinion of the court was delivered by MORTON I. GREENBERG, J.A.D.
The State of New Jersey (State) appeals from a decision of the Public Employment Relations Commission (PERC) in a scope-of-negotiations proceeding between the State and Local 195, International Federation of Professional and Technical Engineers (Local 195), the majority representative of certain employees of the State. The disputed contractual provisions relate to three subjects: (1) contracting or subcontracting out work; (2) workweek provisions; (3) transfer and reassignment clauses. The disputed provisions had been contained in the contract between the State and Local 195 for the two-year period from July 1977 through June 1979. The State, however, in negotiating *89 the contract for the two years commencing July 1979, contended that the contract could not contain these provisions because they were either matters of managerial prerogative or were preempted from the bargaining process by specific laws or regulations. See Ridgefield Park Ed. Ass'n v. Ridgefield Park Bd. of Ed., 78 N.J. 144 (1978); State v. State Supervisory Employees Ass'n, 78 N.J. 54 (1978). Local 195 rejected this position. As a result, a scope-of-negotiations proceeding was commenced before PERC. PERC rendered a written decision and order on January 4, 1979, in part sustaining the State with respect to the transfer and reassignment clauses. The balance of the State's contentions were overruled. The State has appealed from this decision. Local 195 has not cross-appealed.
A discussion of the issues in this case requires a review of the pertinent law. Under the New Jersey Employer-Employee Relations Act, L. 1968, c. 303, N.J.S.A. 34:13A-1 et seq., a procedure is established pursuant to which public employers and employees may negotiate with respect to grievances and terms and conditions of employment. The act as originally written was interpreted by the Supreme Court in Dunellen Bd. of Ed. v. Dunellen Ed. Ass'n, 64 N.J. 17 (1973), to provide that items sought to be negotiated were either subjects of managerial discretion and thus nonnegotiable or matters of terms and conditions of employment and thus negotiable. 64 N.J. at 25. However, in 1974 after the amendment to the act by L. 1974, c. 123, PERC developed a tripartite classification to determine whether matters were negotiable. Items sought to be negotiated were either mandatorily negotiable terms and conditions of employment, not lawfully negotiable matters of managerial prerogative, or permissive subjects for negotiation. A permissive subject was one which the parties could choose to negotiate but were not required to do so. See Bridgewater-Raritan Regional Bd. of Ed., 3 N.J.P.E.R. 23 (1976).
Not surprisingly, the Supreme Court again considered the classification of matters sought to be negotiated. See Ridgefield Park Ed. Ass'n v. Ridgefield Park Bd. of Ed., supra; State *90 v. State Supervisory Employees Ass'n, supra. The court reiterated that there are but two categories into which a matter sought to be negotiated may fall, a mandatorily negotiable term and condition of employment or a nonnegotiable matter of managerial prerogative. But even an item that is a term and condition of employment will not be negotiable if preempted by specific statute or regulation.
The Legislature has not defined the phrase "terms and conditions of employment" nor has it comprehensively determined what are subjects of managerial prerogative. Accordingly, the courts have dealt with the subject on a case by case basis. In Dunellen Bd. of Ed. v. Dunellen Ed. Ass'n, 64 N.J. 17 (1973), the Supreme Court (at 25) indicated that "lines between the negotiable and the nonnegotiable will often be shadowy." The Supreme Court in State v. State Supervisory Employees Ass'n, 78 N.J. 54 (1978) said:
... [N]egotiable terms and conditions of employment are those matters which intimately and directly affect the work and welfare of public employees and on which negotiated agreement would not significantly interfere with the exercise of inherent management prerogatives pertaining to the determination of governmental policy. [at 67].
Accordingly, it becomes our duty to determine against this background whether the disputed items are matters of managerial prerogative or of terms and conditions of employment, and if the latter, whether there is a preemption by specific statute precluding their negotiation. In making these assessments we place upon the State the burden of showing that the decision of PERC was incorrect. Id. at 83-84.
The disputed clause with respect to contracting or subcontracting provides as follows:
The State agrees to meet with the Union to discuss all incidences of contracting or subcontracting whenever it becomes apparent that a layoff or job displacement will result.
PERC found on the basis of its prior decisions that this provision was subject to negotiation. See, e.g., In re Little Egg Harbor Tp., 2 N.J.P.E.R. 5 (1976). It indicated that "a decision to subcontract would effectively terminate the employment relationship *91 vis-a-vis the employees in a negotiations unit and would have a `cataclysmic effect on wages, hours, and working conditions' and thus should be subject to the salutory influence of collective negotiations."
Though we do not doubt that subcontracting out work could result in termination of employment of certain employees, we think that PERC was clearly wrong in its decision that the clause is negotiable. The mere fact that the impact of a decision which is otherwise a matter of managerial prerogative is substantial on some employees makes the decision no less a matter of managerial prerogative. Woodstown-Pilesgrove, etc., Bd. of Ed. v. Woodstown-Pilesgrove Reg'l Ed. Ass'n, 81 N.J. 582, 588-591 (1980); In re Maywood Bd. of Ed., 168 N.J. Super. 45, 56-58 (App. Div. 1979), certif. den. 81 N.J. 292 (1979). The initial inquiry is thus a determination of the nature of the decision of the employer which is sought to be subjected to negotiation rather than its impact on the employee, for "If the public employer has acted pursuant to a managerial prerogative, the inquiry may end at this point." Woodstown-Pilesgrove, etc., Bd. of Ed., supra, 81 N.J. at 588.
We think it perfectly plain that a determination to contract or subcontract out work is a matter of managerial prerogative. Clearly inherent in such a decision could be cost criteria, efficiency and quality considerations, determinations as to the time that the service may be needed, necessity to transfer employees, reduction in supervision needed, and indeed any number of factors that from a management point of view may make contracting out work a sound decision. It is difficult to conceive of a more fundamental management decision than the determination of who will perform a particular function. Though the case comes to us in a rather abstract way since a decision to subcontract a particular task is not before us, it is appropriate to consider a hypothetical situation. The State may well find that because outside contractors have specialized equipment, contracting out work may save the State the cost of *92 a large capital expenditure and by permitting more efficient performance reduce labor costs. In such circumstances a decision in favor of subcontracting could be a sound managerial decision. Thus, while we certainly do not suggest that the State should contract out work, we think it clear that a decision to do so is plainly managerial in nature.
Our conclusion that a determination to subcontract work is a managerial prerogative is supported by case law in New Jersey. The Supreme Court in State v. State Supervisory Employees Ass'n, 78 N.J. 54 (1978) stated (at 88): "While a decision to cut the work force to a certain number unquestionably is a predominantly managerial function, the provision of adequate notice to affected employees is certainly a term and condition of employment." The proposal of Local 195 is for discussions of contracting or subcontracting when a layoff or job displacement will result. Layoffs may be the result of the termination of or a reduction in a service, or may be caused from subcontracting work. But regardless of the reason, if the decision of whether a matter is negotiable as a term and condition of employment is made on an impact basis on the employee, there could be no distinction as to the cause of the layoff. Thus, the fact that layoffs may result from subcontracting work cannot make subcontracting a negotiable term and condition of employment since layoffs from other causes are not negotiable. Viewing layoffs from the management perspective, there is no distinction between the character of a decision to shrink a work force by reason of the phasing out or reduction of a service, and a similar reduction because work is subcontracted. Both decisions plainly are fundamental management matters.
In North Bergen Bd. of Ed. v. North Bergen Fed'n of Teachers, 141 N.J. Super. 97 (App. Div. 1976), a school case involving the filling of a promotional position, this court held as follows:
We conclude that the issue of the board's right to select candidates from either within or without the system involves major educational policy and as such must be considered a managerial prerogative. The board, in seeking the best qualified candidates for promotions, should not be restricted in its search to the faculty of *93 the North Bergen schools. Since we do not regard this issue to involve a term or condition of employment, it is neither negotiable nor arbitrable." [at 103-104].
North Bergen concerned not sending work out but bringing employees in. But from the management viewpoint each decision is of equal importance, and thus that case is strong support for the result we reach. Both cases involve the completion of work by persons not from the preexisting work force. While we recognize the difference to the employees in terms of impact, that does not matter since a managerial prerogative is involved.
We are aware that the result we reach is not in accord with decisions elsewhere. Unified School Dist. No. 1, etc. v. Wisconsin Employment Relations Comm'n, 81 Wisc.2d 89, 259 N.W.2d 724 (Sup.Ct. 1977); In re Saratoga Springs School Dist. v. New York Public Employment Relations Bd., 68 App.Div.2d 202, 416 N.Y.S.2d 415 (App. Div. 1979). Nevertheless, we believe that it is required under our law and thus we do not follow these cases decided under different statutes. Burlington Cty. College Faculty Ass'n v. Board of Trustees, 64 N.J. 10, 14 (1973).
The second item of dispute is a workweek provision providing as follows:
Departments which have an ongoing operational need, on a regular basis, to assign employee's schedules which do not provide for five (5) consecutive workdays, will at the request of the Union, discuss such general scheduling needs with the Union.
PERC held this provision negotiable. In its decision it pointed out that the employer has the unilateral right to determine the number of employees to be on duty at any given time, but that within that framework the employer must negotiate over such matters as to which employees may be off duty, at what time, the amount of consecutive time off, the method of selecting the employees to be off and the employees' hours and schedules. The State on its appeal contends:
The determination as to the period of time during which state agencies will be manned, i.e., the appropriate workweek, is a nonnegotiable managerial prerogative and is also governed by statute and therefore is not within the scope of the collective negotiations process.
*94 We see no real difference between the position of the parties on this point. No one challenges the right of the State to determine the number or classification of employees to be on duty at any time. Rather, the disputed provision is directed to negotiations concerning which employees within a given classification will work at any particular time.
Thus understood the provision is negotiable as a term and condition of employment. In Burlington Cty. College Faculty Ass'n v. Board of Trustees, 64 N.J. 10 (1973), the Supreme Court held that the establishment of the school calendar was a major educational policy and thus was not negotiable, but that the days and hours worked by individual members of the faculty were negotiable. In Woodstown-Pilesgrove, etc., Bd. of Ed. v. Woodstown-Pilesgrove Regional Ed. Ass'n, 81 N.J. 582 (1980), the Supreme Court ruled that the fixing of the hours of instruction on a school day was a nonnegotiable management prerogative, but the issue of whether teachers would be paid for working additional hours was negotiable. The provision proposed by Local 195 in no way interferes with the management decision as to when or with how many persons to perform a function, and thus is similar to the matters held negotiable in Burlington County and Woodstown-Pilesgrove.
Finally, with respect to workweek we agree with PERC that the provision is not preempted by N.J.S.A. 52:14-17.13 or N.J.S.A. 52:14-17.14. These sections deal with the hours of the workweek and are not such specific statutes, even as implemented by N.J.A.C. 4:1-18.1, as could render nonnegotiable the provision as sustained by PERC. They provide generally for a 40-hour week in the usual case.
Irvington Policemen's Benevolent Ass'n v. Irvington, 170 N.J. Super. 539 (App. Div. 1979), is not contrary to the result we reach. This court there held that a municipal decision to "initiate and implement a three-shift work schedule which rotates around the clock" was not subject to negotiation. That case is distinguishable because the plan implemented by the municipality *95 was plainly an overall method of assigning police personnel. The court recognized that policemen are special types of employees and, accordingly, the municipality in assigning them must have great discretion. Further, the municipality was of the view that departmental efficiency required the rotating schedule. The proposal by Local 195 implicates no encroachment on managerial prerogatives such as that in Irvington. It is limited to departments which regularly need to assign employees on schedules not providing for five consecutive days.
The final items of dispute are in a portion of the contract relating to transfer and reassignment rights. PERC sustained in part the position of the State which contended that all of the proposed provisions were nonnegotiable. But PERC held that the following provisions were negotiable.[1]
a. When temporary reassignments are made to achieve any of the objectives in B.2 above, employees to be affected will be given maximum possible notice.
b. When personnel changes in a work unit provide opportunities for shift or schedule changes, interested employees may apply for desired assignments to the work unit supervisor.
c. An employee may have on record no more than two (2) requests for reassignment in C. above.
d. An employee desiring reassignment to any job in his organizational unit or department may submit an application through his supervisor in writing to his Personnel Officer stating the reasons for the request.
e. Transfer shall not affect the accumulation of an employee's State or job classification seniority.
f. The consideration of seniority otherwise applicable in reassignments will not apply.[2]
g. The rights of an employee who has voluntarily transferred shall not be adversely affected except that he shall not retain any rights in the unit from which he was transferred.
h. The right of an employee who has been involuntarily transferred shall not be adversely affected but he shall retain no rights in the unit from which he has been transferred except that if he is on a promotional list, his name shall be retained on the promotional eligible list for the unit from which he has been transferred until he has had an opportunity to take a promotional examination in his new unit and the resultant list has been promulgated.

*96 i. Upon any transfer of a permanent employee, all sick leave and vacation balances shall be transferred with the employee.
j. Upon voluntary transfer, all accrued compensatory time will, at the discretion of the State, be transferred with the employee, taken as time off prior to transfer or paid in cash at the employee's current rate of pay.
k. Upon involuntary transfer of a permanent employee, all accrued compensatory time balances shall be transferred with the employee.
Paragraphs a. through d. were sustained on the theory that they were procedural. We agree with this determination. While Ridgefield Park Ed. Ass'n v. Ridgefield Park Bd. of Ed., 78 N.J. 144 (1978), held that the substantive decision to transfer was an inherent managerial responsibility, it did not rule that procedural aspects of a transfer are not terms and conditions of employment. We view the procedural processes of transfer as a term and condition of employment since promotional procedures, though not promotional criteria, are terms and conditions of employment. State v. State Supervisory Employees Ass'n, 78 N.J. 54, 90-91 (1978); In re Byram Tp. Bd. of Ed., 152 N.J. Super. 12, 26-27 (App. Div. 1977).
Paragraphs e. and f. were held negotiable on the basis that they related to seniority. In State v. State Supervisory Employees Ass'n, 78 N.J. 54, 84 (1978), seniority matters were stated to relate to terms and conditions of employment. Contrary to the contention of the State, we find no specific language in N.J.S.A. 11:11-3, N.J.S.A. 11:6-2(e) or N.J.A.C. 4:1-15.5 preempting these items. N.J.A.C. 4:1-15.5 provides:
(a) The rights of an employee who has voluntarily transferred shall not be adversely affected except that he shall not retain any rights in the unit from which he has transferred.
(b) The rights of an employee who has been transferred involuntarily shall not be adversely affected, but he shall retain no rights in the unit from which he has been transferred except that if he is on a promotional list:
1. His name shall be retained on the promotional eligible list for the unit from which he has been transferred until he has had an opportunity to take a promotional examination in his new unit and the resultant list has been promulgated.
The regulation does not specifically deal with accumulation of seniority. Thus there is no preemption.
*97 Further, the items are not nonnegotiable "impacts" from a nonnegotiable right to transfer. In Woodstown-Pilesgrove, etc., Bd. of Ed., supra, the Supreme Court held that although the school board could lengthen the school day, nevertheless the teachers could negotiate for additional compensation. Here it is clear that negotiation of the "impacts" cannot in any way preclude the State from making the transfer and thus exercising its managerial prerogative.
We hold, however, that paragraph f. relates directly to criteria for reassignment since it recites that when temporary reassignments are made the "consideration of seniority otherwise applicable in reassignments will not apply." Thus the provision is not negotiable. State v. State Supervisory Employees Ass'n, supra, 78 N.J. at 90-91; In re Byram Tp. Bd. of Ed., 152 N.J. Super. 12, 26-27 (App. Div. 1977).
Paragraphs g., h., i., j. and k. were sustained by PERC as relating to terms and conditions of employment concerning retained benefits consistent with N.J.A.C. 4:1-15.5 and matters of sick leave, vacation and other benefits not covered by specific regulations and not being inconsistent with any statute. We agree with this position. N.J.A.C. 4:1-15.5 does provide for certain rights on transfer. But there is no indication in the regulations that the rights are imperative and leave nothing to the employer's discretion or are not consistent with the proposals. State v. State Supervisory Employees Ass'n, supra 78 N.J. at 80-81 (1978). Thus, all of the disputed items relating to transfer and reassignment are valid subjects of negotiations except paragraph f., which is the second sentence of paragraph B(3) of Article XXXIV of the contract.
The decision of PERC is reversed as to the provision with respect to subcontracting and with respect to Article XXXIV, paragraph B(3) of the contract, but is otherwise affirmed.
MORGAN, J.A.D. (dissenting).
I dissent from my colleagues' conclusion that a State proposal to contract out work previously done by public employees is *98 nonnegotiable. That such a determination intimately and directly affects a public employee, displaced from his job by a privately employed one, cannot be and is not the subject of much dispute. State v. State Supervisory Employees Ass'n, 78 N.J. 54, 84 (1978). Although I agree with my colleagues that the decision nonetheless is inherently managerial, implicating considerations such as cost, efficiency and quality, I disagree that the inquiry ends there. Clearly, this case presents the classic conflict described in Woodstown-Pilesgrove, etc., Bd. of Ed. v. Woodstown-Pilesgrove Regional Ed. Ass'n, 81 N.J. 582 (1980), between concepts of managerial prerogatives which may not be negotiated and terms and conditions of employment which are mandatorily negotiable. Consequently, we must balance the needs of the public employer to contract out public work in the attempt to achieve economy, efficiency and quality in the public interest against the needs and interests of the public employees doing the work who would be displaced from their jobs by such a decision. Otherwise, we place it in the power of government to circumvent entirely the collective bargaining apparatus with its employees in favor of dealing in the private sector, without affording those most directly affected by such a course of action a voice in its determination.
First, I fail to perceive how collective bargaining with respect to a given proposal to contract out public work can so compromise management prerogatives as to require its removal from the scope of collective negotiations. Indeed, the reverse might well prove true. Bargaining representatives of the public employees threatened by contracting out with loss of jobs may feel impelled to make concessions in the form of salary, working hours or other conditions directly affecting the cost and efficiency of their job performance. Second, providing public employees with a voice in the process which threatens their livelihood cannot help but promote labor peace and harmony, a major goal of the New Jersey Employer-Employee Relations Act, N.J.S.A. *99 34:13A-2.[1] Third, the determination to contract out does not directly implicate the government's policy-making function or the determination of what services government will deliver. Rather, the determination implicates primarily the means by which governmental services will be delivered. Although selection of means to achieve goals is often inherently managerial, see Bernards Tp. v. Bernards Tp. Ed. Ass'n, 79 N.J. 311 (1979), it more commonly provides an appropriate setting for collective negotiations.
It is not without significance that my colleagues stand alone in their conclusion, contrary to several other courts considering the same problem. At issue in Unified School Dist. No. 1, etc. v. Wisconsin employment Relations Comm'n, 81 Wisc.2d 89, 259 N.W.2d 724 (1977), was the negotiability of a school district's decision to subcontract its food service program to a private corporation. The Supreme Court of Wisconsin there held that such a decision was mandatorily negotiable:
... The decision to subcontract the district's food service program did not represent a choice among alternative social or political goals or values.
The policies and functions of the district are unaffected by the decision. The decision merely substituted private employees for public employees. The same work will be performed in the same places and in the same manner. The services provided by the district will not be affected....

*100 The primary impact of this decision is on the "conditions of employment"; the decision is essentially concerned with wages and benefits, and this aspect dominates any element of policy formulation. The Commission and the circuit court were therefore correct in holding that bargaining was mandatory with respect to the decision ... [259 N.W.2d at 732]
In re Saratoga Springs City School Dist. v. New York State Public Employment Relations Bd., 68 App.Div.2d 202, 416 N.Y.S.2d 415 (App.Div. 1979), contains an expression of similar views. There, the district had determined unilaterally to replace district employees with those engaged by a private employer with whom the district had subcontracted. The Public Employment Relations Board held that the district had violated its duty to negotiate in good faith with its employees concerning that subcontract. On appeal, PERB's determination was affirmed, the court concluding that there was a reasonable basis for it. As noted by that court:
There is a substantial difference between the abolition of civil service positions to effectuate a reduction in the work force and the abolition of positions for the purpose of subcontracting for the same services without the reduction of the work force even though both may result in an economic benefit to the taxpayer. [416 N.Y.S.2d at 419]
In Van Buren Public School Dist. v. Wayne Cty. Circuit Judge, 61 Mich. App. 6, 232 N.W.2d 278 (App.Ct. 1975), the court specifically considered the possible beneficial impact of collective negotiations on the government's proposal to contract out public work:
We are not convinced that bargaining would have served no purpose. The merits of Van Buren's decision to subcontract are not so clear as to eliminate the need for discussion. Union input might reveal aspects of the problem previously ignored or inadequately studied by Van Buren. The union may well be able to offer an alternative to the one chosen by Van Buren which would fairly protect the interests and meet the objectives of both. Surely discussion of the subject would have done much to `promote industrial peace' and may even have prevented the present lawsuits. Negotiation, even if ultimately unsuccessful, does much to appease; explanation at the bargaining table will sooner quell anger than receipt of a tersely worded termination slip.... [232 N.W.2d at 288]
Whether a matter in dispute is within the scope of collective negotiations is a determination committed in the first instance to PERC. State v. State Supervisory Employees Ass'n, 78 N.J. *101 54, 83 (1978). The scope of our review of a PERC decision is a narrow one. Id. Moreover, in exercising our necessarily limited role we should take cognizance of PERC's expertise in this area, defer to it, and uphold its determination unless clearly without factual or legal foundation. Whether one agrees or disagrees with the challenged determination concerning the negotiability of proposals to contract out public work, one can only conclude that PERC's resolution of that problem has ample factual and legal support. We should uphold it.
NOTES
[1] We have redesignated the provisions for this opinion.
[2] This provision follows directly after provision a., supra, and relates to it.
[1] N.J.S.A. 34:13A-2 provides:

It is hereby declared as the public policy of this State that the best interests of the people of the State are served by the prevention or prompt settlement of labor disputes, both in the private and public sectors; that strikes, lockouts, work stoppages and other forms of employer and employee strife, regardless where the merits of the controversy lie, are forces productive ultimately of economic and public waste; that the interests and rights of the consumers and the people of the State, while not direct parties thereto, should always be considered, respected and protected; and that the voluntary mediation of such public and private employer-employee disputes under the guidance and supervision of a governmental agency will tend to promote permanent, public and private employer-employee peace and the health, welfare, comfort and safety of the people of the State. To carry out such policy, the necessity for the enactment of the provisions of this act is hereby declared as a matter of legislative determination.