64 N.J. 17 (1973)
311 A.2d 737
DUNELLEN BOARD OF EDUCATION, PLAINTIFF-APPELLANT, AND COMMISSIONER OF EDUCATION OF NEW JERSEY, PLAINTIFF-INTERVENOR-APPELLANT,
v.
DUNELLEN EDUCATION ASSOCIATION AND PUBLIC EMPLOYMENT RELATIONS COMMISSION, DEFENDANTS-RESPONDENTS.
The Supreme Court of New Jersey.
Reargued September 11, 1973.
Decided November 20, 1973.
*19 Mr. Edward J. Johnson, Jr., argued the cause for the plaintiff-appellant.
Mr. Theodore A. Winard, Assistant Attorney General, argued the cause for the plaintiff-intervenor-appellant (Mr. George F. Kugler, Jr., Attorney General, attorney; Mr. Stephen Skillman, Assistant Attorney General, of counsel; Mr. Michael S. Bokar, Deputy Attorney General, on the brief).
Mr. Thomas P. Cook argued the cause for the New Jersey School Boards Association, Amicus Curiae.
Mr. Abraham L. Friedman argued the cause for the respondent Dunellen Education Association (Messrs. Rothbard, Harris & Oxfeld, attorneys; Mr. Emil Oxfeld, of counsel).
Mr. John F. Lanson, attorney for the Public Employment Relations Commission, filed a statement on its behalf (Mr. David A. Wallace, of the New York bar, of counsel).
The opinion of the Court was delivered by JACOBS, J.
The plaintiff Dunellen Board of Education filed a complaint in the Chancery Division seeking to restrain the defendant Dunellen Education Association from proceeding to arbitration of an alleged grievance under the agreement between them for the school year 1971-72. The Public Employment Relations Commission was also named as a defendant but it would appear to be merely a nominal party. The Commissioner of Education was granted leave to intervene as a party plaintiff and the New Jersey School Boards Association was granted leave to participate as amicus curiae. The Dunellen Education Association filed an answer and counterclaim in which it sought dismissal of the complaint and, on motion, the Chancery Division entered a summary judgment dismissing the complaint with costs to be taxed *20 against the Dunellen Board of Education. The Board of Education and the Commissioner of Education filed separate notices of appeal to the Appellate Division and, before argument there, we certified on the Commissioner's application. 62 N.J. 188 (1973).
The Dunellen Board of Education supervises the K-12 schools within its district and the Dunellen Education Association is the exclusive negotiating representative of the teachers employed by the Board. Pursuant to N.J.S.A. 34:13A-1 et seq. the Board and the Association entered into a written agreement for the 1971-72 school year which set forth, inter alia, salary schedules, extra-duty assignments, various stated rights of the Board, the teachers and the Association, and statements of the negotiation procedure and the grievance procedure. A grievance was defined to be a claim by a teacher or group of teachers "based upon an alleged violation, interpretation, or application, or an administrative decision contrary to the specific provisions of this agreement." A grievance and the procedure relative thereto were expressly declared not to be deemed applicable to: "(a) Any rule of the state board of education; (b) Any rules pertaining to the internal management of the board; (c) A complaint of a non-tenure teacher which arises by reason of his not being reemployed; (d) A complaint by any certificated personnel occasioned by appointment to or lack of appointment to, retention in or lack of retention in any position for which tenure is either not possible or not required; however said personnel shall have the right of appeal to the Board and all parties agree to abide by the decision made at this level."
The grievance procedure set forth in the agreement contemplated four levels; the first involved oral discussion with the employee's immediate superior; the second involved a further step before the Superintendent of Schools; the third involved a still further step before the Board; and the fourth was provided for in the following terms: "In the event an *21 employee is dissatisfied with the determination of the Board he shall have the right of arbitration pertaining to the interpretation of this contract pursuant to rules and regulations established by the Public Employment Relations Commission under the provisions of Chapter 303, Laws of 1968." (N.J.S.A. 34:13A-1 et seq.).
Shortly after the agreement between the Board and the Association took effect the then Social Studies Chairman resigned. At that point the Board concluded that it would be educationally desirable to consolidate the Chairmanships of the Social Studies Department and the English Department into a newly created Humanities Chairmanship. It did so and appointed the Chairman of the English Department as Humanities Chairman. There was nothing in the agreement between the Board and the Association which purported to deal with matters such as consolidation of chairmanships and the only specific reference to the Social Studies Chairman and the English Chairman was in a schedule captioned "Extra-Duty Assignments  1971-72"; that schedule provided that the Social Studies Chairman and the English Chairman would each be paid the sum of $530 for his extra duties as Chairman. The only other reference in the agreement to department chairmen as such was the provision that "Department Chairmen shall be assigned two preparation periods during which they shall perform their departmental duties." This was complied with and is not in issue here.
After the positions were consolidated, the Association filed a grievance which was rejected by the Superintendent and the Board. Thereafter the Association sought arbitration and the Public Employment Relations Commission was requested to appoint an arbitrator. The Commission mailed a proposed list of arbitrators to the Association and the Board and at that point the Board filed its Chancery Division complaint seeking a restraint. The Board's position was that submitting the matter to arbitration would be improper since (1) the agreement did not in anywise restrict its authority to consolidate *22 the Chairmanships of the Social Studies Department and the English Department and to appoint the Chairman of the English Department as Humanities Chairman, (2) if the agreement were construed to restrict such consolidation and appointment it would amount to an illegal and unenforceable delegation of the Board's statutory responsibilities, and (3) the controversy was one arising under the School Laws of New Jersey and was therefore within the exclusive jurisdiction of the Commissioner of Education.
The Commissioner's position was that he has primary jurisdiction to determine whether the controversy is one arising under the school laws within his exclusive jurisdiction and that arbitration should be stayed pending such administrative determination; on the other hand the amicus curiae urged that whether the matter is arbitrable should be determined judicially and suggested that only in rare instances presenting novel issues of school law or educational policy would it be appropriate to refer to the Commissioner. The Education Association's position was that the Commissioner has no function at all in connection with the controversy and that the matter should be permitted to proceed to arbitration. The Chancery Division agreed with the Education Association expressing the view that the dispute was one arising from the contract and that "the expertise of the Commissioner" was not required for its determination. At oral argument before us it was pointed out that after the expiration of the 1971-72 school year the Board reverted to separate Social Studies and English Department Chairmanships and that consequently the matter at hand may technically be deemed moot. But no one now suggests dismissal for mootness and all are desirous of having some judicial expression on the larger issues for future guidance. Accordingly we shall deal with the merits. See John F. Kennedy Memorial Hospital v. Heston, 58 N.J. 576, 579 (1971); Bd. of Ed., E. Brunswick Tp. v. Tp. Council, E. Brunswick, 48 N.J. 94, 109 (1966).
*23 New Jersey's Constitution contains an explicit mandate for legislative maintenance and support of a "thorough and efficient" system of free public schools. N.J. Const., Art. 8, sec. 4, para. 1. In fulfillment of the mandate the Legislature enacted provisions entrusting school supervision and management to local school boards (N.J.S.A. 18A:10-1; N.J.S.A. 18A:11-1), subject to the supervisory control afforded by the Legislature to the State Board of Education in the Department of Education (N.J.S.A. 18A:4-10) and to the Department's chief executive and administrative officer, the State Commissioner of Education (N.J.S.A. 18A:4-22, 23). The Commissioner was expressly empowered to hear and determine all controversies arising under the school laws or under the rules of the State Board or the Commissioner (N.J.S.A. 18A:6-9) and in a series of decisions this Court reaffirmed the great breadth of the Commissioner's powers. See Jenkins, et al. v. Tp. of Morris School Dist. and Bd. of Ed., 58 N.J. 483, 492 (1971); Bd. of Ed. of Elizabeth v. City Coun. of Elizabeth, 55 N.J. 501, 505 (1970); Booker v. Board of Education, Plainfield, 45 N.J. 161, 173 (1965); In re Masiello, 25 N.J. 590, 601 (1958).
Among the powers expressly vested by the Legislature in the local school boards was the traditional management power to employ, promote, transfer and dismiss and to adopt appropriate rules in connection therewith, all subject of course to specific statutory provisions. N.J.S.A. 18A:11-1; N.J.S.A. 18A:16-1; N.J.S.A. 18A:27-4; N.J.S.A. 18A:28-9. In their relations with their employees the boards were clearly to be distinguished from private employers in private industry. The members of the boards were public officials charged with public responsibilities which they could not lawfully "abdicate or bargain away." Lullo v. Intern. Assoc. of Fire Fighters, 55 N.J. 409, 440 (1970); cf. Edwards, "The Emerging Duty to Bargain in the Public Sector," 71 Mich. L. Rev. 885, 912 (1973); Note, "Collective Bargaining and the California Public Teachers," 21 Stan. L. Rev. 340, 369 *24 (1969). And their employees were public employees who were by law denied the right to strike which in private industry is a lawful incident of the right to collective bargaining. Though the Constitution of 1947 guaranteed the right to collective bargaining in private industry, it provided more narrowly with respect to persons in public employment that they "shall have the right to organize, present to and make known to the State, or any of its political subdivisions or agencies, their grievances and proposals through representatives of their own choosing." N.J. Const., Art. 1, para. 19; Delaware River and Bay Auth. v. International Org., etc., 45 N.J. 138, 145 (1965); Lullo v. Intern. Assoc. of Fire Fighters, supra, 55 N.J. at 415.
In 1968 the Legislature enacted Chapter 303 known as the "New Jersey Employer-Employee Relations Act." N.J.S.A. 34:13A-1 et seq. That Act provides in section 7 (N.J.S.A. 34:13A-5.3) that a majority representative of public employees in an appropriate unit may act for all employees in the unit and that the majority representative and designated representatives of the public employer shall meet at reasonable times and "negotiate in good faith" with respect to grievances and terms and conditions of employment. The section provides further that when an agreement is reached, the "terms and conditions of employment" shall be embodied in a signed writing. And finally the section provides that public employers shall negotiate written policies setting forth "grievance procedures" which shall be included in the agreement and that "Such grievance procedures may provide for binding arbitration as a means for resolving disputes."
Nowhere in the Act did the Legislature define the phrase "terms and conditions" as used in section 7 nor did it specify what subjects were negotiable and what subjects were outside the sphere of negotiation. In section 10 it did expressly provide that no provision in the act shall "annul or modify any statute or statutes of this State." N.J.S.A. 34:13A-8.1. In the light of this provision it is our clear judicial responsibility *25 to give continuing effect to the provisions in our Education Law (Title 18A) without, however, frustrating the goals or terms of the Employer-Employee Relations Act (N.J.S.A. 34:13A-1 et seq.).
Surely the Legislature, in adopting the very general terms of L. 1968, c. 303, did not contemplate that the local boards of education would or could abdicate their management responsibilities for the local educational policies or that the State educational authorities would or could abdicate their management responsibilities for the State educational policies. See Lullo v. Intern. Assoc. of Fire Fighters, supra, 55 N.J. at 440; Bd. of Ed., Tp. of Rockaway v. Rockaway Tp. Ed. Ass'n., 120 N.J. Super. 564, 569 (1972); cf. Porcelli v. Titus, 108 N.J. Super. 301, 312 (1969), certif. denied, 55 N.J. 310 (1970). On the other hand it did contemplate that to the extent that it could fairly be accomplished without any significant interference with management's educational responsibilities, the local boards of education would have the statutory responsibility of negotiating in good faith with representatives of their employees with respect to those matters which intimately and directly affect the work and welfare of their employees.
The lines between the negotiable and the nonnegotiable will often be shadowy and the legislative reference to "terms and conditions of employment" without further definition hardly furnishes any dispositive guideline. As the Nebraska Supreme Court noted in School District of Seward Education Association v. School District of Seward, 188 Neb. 772, 199 N.W.2d 752 (1972), "generally, teacher organizations have given the term `conditions of employment' an extremely broad meaning, while boards of education have tried to restrict that term to preserve their management prerogatives and policy-making powers." The court noted further that while there were many nebulous areas, "boards should not be required to enter negotiations on matters which are predominantly matters of educational policy, management prerogatives or statutory *26 duties of the board of education." Illustratively, the court expressed the view that matters such as the following would fall exclusively within management's prerogatives and would not be the subject of compulsory negotiation: "The right to hire; to maintain order and efficiency; to schedule work; to control transfers and assignments; to determine what extracurricular activities may be supported or sponsored; and to determine the curriculum, class size, and types of specialists to be employed." 199 N.W.2d at 759. See Dupont and Tobin, "Teacher Negotiations in the Seventies," 12 Wm. & Mary L. Rev. 711, 712 n. 3 (1971).
In Joint School District No. 8 v. Wisconsin Emp. Rel. Bd., 37 Wis.2d 483, 155 N.W.2d 78 (1967), the lower tribunals determined that the school calendar was a condition of employment negotiable under Wisconsin's Employment Peace Act § 111.70; that act did not, however, contain any provision comparable to our section 10 (N.J.S.A. 34:13A-8.1). Cf. West's Wis. Stat. Ann. § 111.91 (Cum. Supp. 1973). On appeal the Wisconsin Supreme Court first pointed out that many items and restrictions in the school calendar are established by statutes and to that extent may not be changed by negotiation. But it then held that what was left by the statutes to the school boards in respect to the school calendar was "subject to compulsory discussion and negotiation." The court was careful to point out that the board was under no obligation to forego its own judgment as to what should be the school calendar, noting that:
... under sec. 111.70 the school board need neither surrender its discretion in determining calendar policy nor come to an agreement in the collective-bargaining sense. The board must, however, confer and negotiate and this includes a consideration of the suggestions and reasons of the Teachers. But there is no duty upon the school board to agree against its judgment with the suggestions and it is not a forbidden practice for the school board to determine in its own judgment what the school calendar should be even though such course of action rejects the Teachers wishes. The refusal to come to a "settlement" may, of course, place the school board in a position where the Teachers can invoke the fact-finding procedure, but the findings *27 of the fact finder if adverse to the board are not binding upon it. The force of the fact-finding procedure is public opinion, and the legislative process thrives on such enlightenment in a democracy. 155 N.W.2d at 83-84.
In West Hartford Education Association v. De Courcy, 162 Conn. 566, 295 A.2d 526 (1972), the Connecticut Supreme Court concluded, from the history and terms of its legislation, that the school calendar was an item which the Connecticut Legislature had excluded from mandatory negotiation. The court recognized that the phrase "conditions of employment" and its purported antithesis "educational policy" did not denote two definite and distinct areas since "Many educational policy decisions make an impact on a teacher's conditions of employment and the converse is equally true" (295 A.2d at 534); but nonetheless it readily discharged its case by case responsibility to determine whether any particular controverted subject matter fell within the area of a negotiable condition of employment or whether it was an educational policy determination exclusively for the school board. In passing, the court noted that even where the subject was a mandatory one the board, so long as it negotiated in good faith, did not violate its duty by declining to make a counter proposal or concession. 295 A.2d at 538-539; cf. East Hartford Ed. Ass'n. v. East Hartford Bd. of Ed., 30 Conn. Sup. 63, 299 A.2d 554, 556 (1972). In State College Ed. Ass'n. v. Pennsylvania Labor Rel. Bd., 9 Pa. Cmwlth. 229, 306 A.2d 404 (1973), the Commonwealth Court of Pennsylvania held that the school calendar was not mandatorily negotiable since it was a matter of "inherent managerial policy" rather than one of the "terms and conditions of employment" within the provisions of its Public Employe Relations Act. 306 A.2d at 412-414.
In Board of Education v. Associated Teachers, 30 N.Y.2d 122, 331 N.Y.S.2d 17, 282 N.E.2d 109 (1972), the New York Court of Appeals broadly construed its Taylor Law, Civil Service Law, § 200 et seq. (McKinney 1973), *28 under which public employers must negotiate in good faith with employee representatives with respect to the terms and conditions of employment. It held, inter alia, that provisions for tuition-reimbursement to teachers for graduate courses and reimbursement for job related personal property damage were terms or conditions of employment within the contemplation of the law. And it upheld a contractual provision which contemplated that any tenure teacher who was dismissed for alleged cause could pursue the contractual grievance procedure including ultimate binding arbitration to the total exclusion of any proceeding before the Commissioner of Education. 282 N.E.2d at 114; cf. Legislative Conf. of City U. of N.Y. v. Board of H. Ed., 38 A.D.2d 478, 330 N.Y.S.2d 688, aff'd, 31 N.Y.2d 926, 340 N.Y.S.2d 924, 293 N.E.2d 92 (1972). While this latter holding may conform with the goals of the New York Legislature in enacting the Taylor Law, we are not prepared to say that a comparable result, which would represent a radical departure from settled practices in our education field, would conform with the goals of the New Jersey Legislature.
New Jersey's laws relating to education have had a long-standing provision of specific nature dealing with tenure teachers and their dismissal. N.J.S.A. 18A:6-10; Laba v. Newark Board of Education, 23 N.J. 364, 384 (1957). They have had an equally long-standing provision vesting statutory jurisdiction in the Commissioner of Education over controversies arising under the school laws which have traditionally included dismissal proceedings against tenure teachers. N.J.S.A. 18A:6-9; Laba v. Newark Board of Education, supra, 23 N.J. at 381; Bd. of Ed., E. Brunswick Tp. v. Tp. Council, E. Brunswick, supra, 48 N.J. at 102. When the Employer-Employee Relations Act (N.J.S.A. 34:13A-1 et seq.) was passed there was no reference to the provisions in the education laws but, as noted earlier in this opinion, there was a blanket statement in section 10 to the effect that no provision in the Employer-Employee Relations Act shall *29 "annul or modify any statute or statutes of this State." N.J.S.A. 34:13A-8.1. In the light of this strong qualifying statement and, absent further clarifying legislation, we are not prepared to construe the general provision in section 7 (N.J.S.A. 34:13A-5.3), authorizing the parties to agree on grievance procedures providing for "binding arbitration as a means for resolving disputes," as embodying legislative contemplation that the parties may agree on such arbitration in total replacement of the Commissioner's hearing of dismissal proceedings now required by the express terms of N.J.S.A. 18A:6-10. Cf. Norwalk Teachers Ass'n. v. Board of Education, 138 Conn. 269, 83 A.2d 482, 487, 31 A.L.R.2d 1133 (1951).
In the matter at hand we are not concerned with the dismissal of any individual teacher nor are we concerned with the rights of any individual teacher. The Dunellen Board, having concluded that it would be educationally desirable to consolidate the Chairmanships of the Social Studies Department and the English Department into a newly created Humanities Chairmanship, proceeded to do so at a time when no individual teacher would be adversely affected. There was a vacancy in the Chairmanship of the Social Studies Department and the Chairman of the English Department was appointed as Humanities Chairman. This step may have enabled experimental coordination of the two departments to ascertain whether their educational productivity might be increased through measures of joint activity. It was compatible with inter-disciplinary approaches finding recent favor among higher level educators.
In any event, the determination to consolidate was predominantly a matter of educational policy which had no effect, or at most only remote and incidental effect, on the "terms and conditions of employment" contemplated by N.J.S.A. 34:13A-5.3. So far as our educational laws are concerned, it is entirely clear that the Board had the statutory responsibility for such educational determinations. See, *30 e.g., N.J.S.A. 18A:11-1; N.J.S.A. 18A:16-1; N.J.S.A. 18A:27-4; N.J.S.A. 18A:28-9. And so far as our education laws are concerned, it is equally clear that the Commissioner had an overall responsibility for supervising such educational determinations (N.J.S.A. 18A:4-23; N.J.S.A. 18A:4-25; N.J.S.A. 18A:4-28.3) and for hearing controversies and disputes with respect thereto as "arising under the school laws" (N.J.S.A. 18A:6-9).
Whatever may be the conflicting views on other subject matters, it would appear evident that the consolidation of chairmanships represents a matter predominantly of educational policy within management's exclusive prerogatives under the lines drawn in the decisions cited earlier in this opinion. See School Dist. of Seward Education Association v. School District of Seward, supra, 188 Neb. 772, 199 N.W.2d 752; Joint School District No. 8 v. Wisconsin Emp. Rel. Bd., supra, 37 Wis.2d 483, 155 N.W.2d 78; West Hartford Educational Association v. De Courcy, supra, 162 Conn. 566, 295 A.2d 526. Indeed even in states where expansive approaches to the subject of negotiability have been taken, it has generally been acknowledged that creations and terminations of educational positions which, as here, do not affect specific individuals are exclusively board prerogatives. See Doering, "Impasse Issues in Teacher Disputes Submitted to Fact Finding in New York," 27 Arb. J. (n.s.) 1, 4 (Mar. 1972).
In some states the legislatures have discharged their responsibilities by enumerating subjects in the educational field which are to be negotiable. Cf. Rev. Code. Wash. Ann. 28A. 72.030 (1970); West's Wis. Stat. Ann., supra, § 111.91; Kilberg, "Appropriate Subjects for Bargaining in Local Government Labor Relations," 30 Md. L. Rev. 179 (1970); Moskow & McLennan, "Teacher Strikes and Dispute Settlement Policy," 14 N.Y.L. Forum 281 (1968). Under such statutes the judicial course is fairly prescribed leaving only such constitutional issues as may be pertinent. See City *31 of Biddeford v. Biddeford Teachers Ass'n., 304 A.2d 387 (Me. 1973); cf. Group Health Insurance of New Jersey v. Howell, 40 N.J. 436 (1963); Wellington and Winter, "The Limits of Collective Bargaining in Public Employment," 78 Yale L.J. 1107 (1969). Thus far our Legislature has not chosen to set forth the individual subjects which are to be negotiable and has left the matter to the judiciary for case by case determination as to what are terms and conditions of employment within the meaning of N.J.S.A. 34:13A-5.3. But it has at the same time clearly precluded any expansive approach here by directing unequivocally that provisions in existing statutes such as our educational laws shall not be deemed annulled or modified. N.J.S.A. 34:13A-8.1.
In the light of all of the foregoing we are satisfied that the Dunellen Board could not legally have agreed to submit to binding arbitration, the soundness or validity of its determination that it would be educationally desirable to consolidate the Chairmanships of the Social Studies Department and the English Department into a newly created Humanities Chairmanship. We are further satisfied that, when nonetheless the issue was actually raised, it should have been presented to the Commissioner of Education for his determination as a dispute arising under the school laws and that, accordingly, the Chancery Division erred in dismissing the Board's action and in entering summary judgment for the Education Association. Strictly this holding relates only to arbitrability but all that has been said earlier in this opinion leads to the conclusion that the consolidation was not a proper subject of either arbitration or mandatory negotiation under N.J.S.A. 34:13A-5.3.
The holding that the consolidation was predominantly a matter of educational policy not mandatorily negotiable does not indicate that the Board would not have been well advised to have voluntarily discussed it in timely fashion with the representatives of the teachers. Peaceful relations between the school administration and its teachers is an ever present *32 goal and though the teachers may not be permitted to take over the educational policies entrusted by the statutes to the Board they, as trained professionals, may have much to contribute towards the Board's adoption of sound and suitable educational policies. Before the passage of New Jersey's Employer-Employee Relations Act (N.J.S.A. 34:13A-1 et seq.) it was recognized that public employees had the right to be heard through their representatives on their proposals and grievances. The Act significantly broadened that right and, with the goal of peaceful labor relations in mind, created fields of mandatory negotiation. It would seem evident that, when dealing in fields with which the teachers are significantly concerned though outside the fields of mandatory negotiation, the end of peaceful labor relations will generally be furthered by some measure of timely voluntary discussion between the school administration and the representatives of its teachers even though the ultimate decisions are to be made by the Board in the exercise of its exclusive educational prerogatives.
Reversed.
For reversal  Justices JACOBS, HALL, SULLIVAN, PASHMAN and CLIFFORD.  5.
For affirmance  None.