256 N.J. Super. 104 (1992)
606 A.2d 822
IN THE MATTER OF RUTGERS, THE STATE UNIVERSITY, RESPONDENT-APPELLANT,
v.
RUTGERS COUNCIL OF AAUP CHAPTERS, PETITIONER-RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Argued February 19, 1992.
Decided April 20, 1992.
*107 Before Judges MICHELS, HAVEY and CONLEY.
John B. Wolf argued the cause for appellant Rutgers, The State University of New Jersey (John B. Wolf, of counsel and on the brief).
Paul Schachter argued the cause for respondent (Reinhardt & Schachter, attorneys, Paul Schachter, of counsel and on the brief).
Robert E. Anderson, General Counsel, argued the cause for the New Jersey Public Employment Relations Commission (Robert E. Anderson on the brief).
The opinion of the court was delivered by CONLEY, J.S.C. (temporarily assigned).
This appeal arises from a determination by the Public Employment Relations Commission (PERC) on a scope of negotiations petition filed by the Rutgers Council of AAUP Chapters (AAUP) pursuant to N.J.S.A. 34:13A-5.4d. The petition sought a determination on numerous proposed contract provisions affecting *108 Article XIV of the 1986-1989 collective negotiations agreement between the parties which the AAUP sought to negotiate for the successor contract. That Article governs faculty evaluations, promotions and reappointments. PERC determined all of the proposals were procedural and, therefore, mandatorily negotiable. On appeal Rutgers seeks reversal as to eleven of those proposals. We conclude PERC mistakenly mandated negotiations on seven of the proposals under the guise of "procedure" and, thus, reverse in part and affirm in part.
Reappointments and promotions at Rutgers for teaching and research faculty are based on an evaluation of the individual faculty member's teaching, scholarship and service record. Promotion from assistant professor to associate professor conveys tenure and once a faculty member has attained the position of associate professor, Rutgers no longer has the freedom to dismiss, except for specific reasons outlined in University regulations. The evaluation process for promotions and reappointments then is critical to the University's goal of excellence in the quality of its faculty and its overriding concern for quality of education offered its students.
This evaluation process is set forth in the University's Academic Reappointment/Promotion Instructions. In order to assure an effective and accurate evaluation of each individual candidate, the University has implemented a system utilizing several levels of evaluation, referred to as a "hierarchical" peer review process. There are three levels of review: the department; the dean, and the Promotion Review Committee. The latter is a University-wide committee of four senior scholars and three campus provosts. Following this evaluation process, the president will then make a final recommendation to the Board of Governors. The Promotion Instructions specify the composition of each review level, the role of each particular evaluator or evaluative body, and the manner of participation in the process.
*109 At the department level, the department chair initiates recommendations for faculty appointments, reappointments or promotions. A reading committee provides the department with an assessment of the candidate's scholarly achievement, but not a recommendation for promotion. After review at the department level, the promotional packet for the individual candidate, consisting of a collection of materials compiled and used in the evaluation of the candidate, is forwarded along with the recommendation by the department chair to the Advisory Committee on Appointments and Promotions. This Committee is advisory to the dean. Following the recommendations of both the department and the Committee, the dean makes his or her independent recommendation.
If the department's recommendation and the dean's recommendation are negative, the dean is the final level of evaluation. The department's recommendation is negative when less than two-thirds of those voting support the candidate. The votes include positive, negative and abstentions. Abstentions are not counted as positive votes.
The department chair serves as the department representative and may be asked by the Advisory Committee to amplify the department's report. The chair also meets with the dean to discuss the proposed action where the dean intends to make a recommendation different from that of the department. The chair is also responsible for providing notice to the candidates, compiling the necessary materials for evaluation and preparing and certifying the evaluation forms.
The Promotion Instructions contain forms to be used in connection with the evaluation of a candidate for reappointment or promotion. Form No. 4 is the "Narrative Summary of Departmental Recommendation." It calls for separate evaluations in narrative form for the criteria of teaching, scholarship and service. Page two of the form calls for recording the recommendation of the department and reporting the number eligible to vote, the number voting "yes," the number voting *110 "no," and the number abstaining. There is a similar form for the dean's recommendation. The evaluation of the departmental Reading Committee is recorded in narrative form, as are the evaluations by the dean, the Advisory Committee on Appointments and Promotions and the Promotion Review Committee.
With respect to participation in the process by the candidate, the Instructions provide various forms of input. For instance, Section E states:
The department chairperson shall provide the faculty member with a signed and completed Recommendation Information Form. Within five days of its receipt, the faculty member will sign and return the Form to indicate concurrence with its content, or, if there is a dispute between the faculty member and the chairperson as to the content of the Form which they are unable to resolve, the faculty member shall so indicate in the space provided above his/her signature attaching an explanation to the Form.
At the time the faculty member submits a signed Recommendation Information Form, he/she shall submit to the department chairperson two copies of any documents or materials he/she wishes to have considered. A list, compiled by the faculty member, of the documents submitted to the chairperson shall be attached to the promotion packet. It shall be the responsibility of the chairperson to circulate that list and all documents or materials submitted by the candidate, together with any other relevant material to the appropriate reviewing bodies.
The candidate may suggest potential outside evaluators and may discuss with his/her department chairperson qualified persons from whom letters may be solicited. The candidate, in addition, may prepare a list of persons in his/her field from whom he/she prefers letters of evaluation not be solicited. The candidate shall provide a written explanation for the exclusion of each person on that list. If a letter of evaluation is solicited from an individual on the candidate's not for solicitation list, the candidate's written explanation shall be attached to the individual's letter of recommendation. A department chair or dean may, at his/her discretion, also attach an explanation for his/her decision to solicit a letter from the individual. Such attachments, whether prepared by the candidate, the department chairperson, or the dean, shall be held, like the letters to which they refer, in confidence.
If the faculty member wishes to include a lengthy unpublished manuscript and requires copying services, he/she may contact the Associate Dean for Administration, Law School, Newark; the Associate Dean for Student Life, Camden; or the Business Manager, Faculty of Arts and Sciences, New Brunswick at least 30 days prior to the date on which copies are needed....
Confidential letters of evaluation may be submitted pursuant to Section F which provides in part:

*111 A minimum of five external confidential letters of evaluation from qualified persons shall be solicited by the candidate's department chair and/or by the candidate's dean. All letters solicited in regard to this candidacy must be included in the promotion packet and forwarded by the department chair for consideration by the appropriate tenured faculty. Unsolicited letters and letters from within the University are not included within this category.
Prior to the solicitation of external letters, the department chair shall submit to the dean a recommended list of referees for each candidate, accompanied by a clear explanation of the suitability of the referee, the relationship of the referee to the candidate and his/her field of study, and documentation demonstrating the referee's professional standing. The department chair shall make available to the dean any list submitted by the candidate of persons from whom he/she prefers letters not be solicited. Chairs, in developing lists of appropriate referees to submit to the dean, shall consult the candidate about appropriate experts in his/her field of study, but the selection of external referees must be made by the department chair and dean. The dean will select from among the referees proposed by the department chair, and add any additional referees he/she deems necessary. In conducting his/her evaluation of the candidacy as set forth in Section L. below, the dean, at his/her discretion, may solicit letters from additional external referees.
Moreover the Instructions provide for additions to the promotional material and a candidate's ability to rebut or respond to material added during the evaluation process. Thus, section H states:
If any document or documents, other than confidential outside letters of recommendation, the official reappointment/promotion forms, continuation pages added to these forms as described in these instructions, reports of reading committees, supplements to confidential letters (Section E, paragraph 3), and materials submitted by the candidate, are added to the promotion packet by an evaluative body, a copy of said document(s) shall be transmitted immediately to the candidate; the candidate shall have the right to submit a response or rebuttal within five (5) working days. The response shall be directed to that level of the evaluation at which the added document was received and shall become a part of the promotion packet. Any documents that are (1) physically present during the evaluation and (2) specifically referred to during the deliberations of the evaluative body and (3) which a majority of the evaluative body agrees have a direct bearing on the evaluation must be added to the packet in accordance with this procedure.
Subsequent to the commencement of the evaluation and prior to January 25, the department chairperson shall, upon request of the candidate, add to the packet evidence of a significant change in the status of materials originally submitted by the candidate if: 1) the chairperson concurs that a significant change has occurred; and 2) such change has occurred since the initiation of the evaluation. If there is a dispute between the candidate and the chairperson as to whether a significant change has occurred in the status of materials *112 originally submitted by the candidate, the Office of the Provost shall make the final determination as to whether evidence of the change shall be added to the packet.
Such additions to the packet, as provided above, shall, in all instances, be submitted to the level or review at which the candidate is then being evaluated. However, if the addition occurs on or before December 4, the addition to the packet shall also be circulated to each earlier level of review so that each earlier level may revise its evaluation should it deem such revision warranted by the addition. If the addition occurs after December 4, but on or before January 25 it shall not be circulated to any earlier level of review, except the dean and the Promotion Review Committee. The dean and/or the Promotion Review Committee may revise the evaluation made at that level should such revision be deemed by the dean or the Promotion Review Committee to be warranted by the addition.
The AAUP sought by way of the proposals involved in this appeal to negotiate certain aspects of the above evaluation process. Proposals 1G and 5, 5A, and 5B would impact upon the role and function of various evaluators and evaluative bodies in the process. Proposal 1G would include in the collective negotiations agreement the following language:
For each candidate, the tenured members of the department shall select in the semester prior to his/her evaluation a tenured faculty member to serve as the departmental representative. The department representative shall serve as an administrator for the candidate's packet, not as a separate evaluator in the process.
Proposals 5, 5A and 5B, would include in the collective negotiations agreement the following language:
The department representative shall present the candidate's packet to each level of review. The departmental representative shall also present the candidate's packet to the Departmental Reading Committee, if there is one, and to the A & P Committee.
A. In those cases in which the Dean expects to reject the advice of the department, the Dean may provide an opportunity for the department to discuss the candidacy. The department's position shall be presented in writing by the department representative. Before such a response, the candidate's department representative shall be provided in writing with specific questions framed by the Dean and designed to focus the representative's comments on those aspects of the candidate's record which raised doubts in the Dean's mind (or in the A & P Committee) about the department's recommendation. The written questions and responses shall become part of the packet.
B. In those cases in which the PRC expects to reject the advice of the department and the Dean, the PRC shall provide an opportunity for the department and Dean to discuss the candidacy. The positions may be presented for discussion in a meeting with the department representative, the Dean, and *113 the PRC. Before the meeting, the candidate's department representative and the Dean shall be provided in writing with specific questions framed by the PRC and designed to focus the representative's and the Dean's comments on those aspects of the candidate's record which raised doubts at the PRC about the department's and Dean's recommendations. At this meeting the department representative and the Dean shall discuss each of the specific questions and immediately thereafter provide the PRC with a written response to each question. The written questions and responses shall become part of the packet.
Proposal 1H impacts upon the functions of the reading committees by including in the agreement:
Recommended guidelines for reading committees: When the department elects to have reading committees summarize and review a candidate's written work, there should be reading committees for all candidates considered that year. In such departments, the department chair and the candidate's department representative should jointly select a reading committee of at least two persons, including at least one person familiar with the candidate's specialty within his/her discipline. When a candidate's work is interdisciplinary, at least one member of the reading committee should be from a second discipline in which the candidate works.
Proposal 8 impacts upon the nature and content of the evaluative forms. Pursuant to that proposal, AAUP sought to add to the collect negotiations agreement the following:
All levels, including the PRC, shall complete forms to record votes and narrative. These forms shall be mutually agreed upon by the AAUP and the University.
The evaluation form to rate individuals shall be mutually agreed upon by the AAUP and the University to report on all the evaluation criteria established by the Administration as appropriate for the candidate and to report the recommendations of each level of evaluation. The rating scales used to evaluate an individual's performance of assigned duties shall be consistent for all individuals. The evaluations in each category shall be recorded in the form of a "grid" showing the vote of the evaluators at each rating level. The University shall establish a uniform rating system. "Not applicable" shall be used in this system whenever a category is inappropriate given the candidate's assigned duties and any other criteria about which the candidate has been informed.
Proposal 2 impacts upon the nature and effect of the departmental level vote. Pursuant to it, AAUP sought to change the requirement of a two-third vote for a positive recommendation, to a majority vote. Thus, the proposal would add to the agreement:
A majority of the tenured faculty members present and voting for a candidacy shall constitute a positive recommendation from the department. Abstentions shall not be counted as part of the total vote.
*114 Proposals 6A, 6B and 6C, on the other hand, relate solely to notice to be given the candidate of the results of the evaluative process. Those proposals sought to add the following language:
A. Deans and directors shall explain fully and in writing the reasons for rejecting a candidacy for reappointment, promotion or tenure who is supported by at least two-thirds or more of the voting department faculty.
B. The PRC shall explain fully and in writing the reasons for rejecting a candidacy for promotion or tenure supported by at least two-thirds or more of the voting department faculty.
C. The President shall explain in writing the reasons for rejecting a candidacy for promotion or tenure recommended by the PRC.
Similarly proposal 3 relates to notice of the critical vote recorded at the department level. It would add the following language:
If majority and minority views are presented [on the departmental vote] the narrative must be constructed so that the weight in terms of numbers of persons holding these positions is made clear.
Likewise, the proposal concerning the second and third sentences of Article XIV, 1E, would simply provide an opportunity to the candidate before the process commences to add an evaluation at the option of the dean. It would add the following language:
A candidate may request of the collegiate dean or other individual designated by the Administration a voluntary evaluation of his/her work as a college fellow when this is applicable. If the evaluation is available, it may be included by the candidate among the materials he/she wishes to have considered....
We agree with PERC that the latter proposals, 1E, 3, 6A, 6B and 6C, concern solely procedural aspects of the evaluative process and are mandatorily negotiable. We, however, disagree that proposals 1G, 1H, 2, 5, 5A, 5B, and 8 can be similarly characterized.
In considering the issues presented by this appeal, we think it important to keep in mind the general parameters governing the scope of collective negotiations in the public sector. It has long been recognized that negotiations in the public sector are far more limited than bargaining in the private sector. Lullo v. Int'l Ass'n of Fire Fighters, 55 N.J. 409, 440, *115 262 A.2d 681 (1970). See Ridgefield Park Ed. Ass'n v. Ridgefield Park Bd. of Ed., 78 N.J. 144, 159, 393 A.2d 278 (1978); Tp. of W. Windsor v. Public Employment Rel. Comm'n, 78 N.J. 98, 114-115, 393 A.2d 255 (1978); Dunellen Bd. of Ed. v. Dunellen Ed. Ass'n, 64 N.J. 17, 23-25, 311 A.2d 737 (1973). Accord Teaneck Bd. of Ed. v. Teaneck Teachers Ass'n, 94 N.J. 9, 13, 462 A.2d 137 (1983). This is so because, unlike private sector employers, public sector officials are not only employers but also public officials charged with governmental responsibility they cannot lawfully "abdicate or bargain away." E.g. Ridgefield Park Ed. Ass'n v. Ridgefield Park Bd. of Ed., 78 N.J. at 159, 393 A.2d 278; Tp. of W. Windsor v. Public Employment Rel. Comm'n, 78 N.J. at 115, 393 A.2d 255. Thus, those items that are mandatorily negotiable pursuant to the New Jersey Employer-Employee Relations Act, N.J.S.A. 34:13A-1 et seq., are only those "terms and conditions of employment ... which intimately and directly affect the work and welfare of public employees and on which negotiated agreement would not significantly interfere with the exercise of inherent management prerogatives pertaining to the determination of governmental policy". Ridgefield Park, 78 N.J. at 156, 393 A.2d 278; State v. State Supervisory Employees Ass'n, 78 N.J. 54, 67, 393 A.2d 233 (1978); Dunellen Ed. Ass'n v. Dunellen Ed. Ass'n., 64 N.J. 17, 25, 311 A.2d 737 (1973). See Bd. of Ed. of Woodstown-Pilesgrove v. Woodstown-Pilesgrove Ed. Ass'n, 81 N.J. 582, 590-91, 410 A.2d 1131 (1980). Moreover, even if a matter directly and intimately affects the work and welfare of public employees and may not impinge on a management prerogative, it is not negotiable if set by statute, rule or regulation. State v. State Supervisory Employees Ass'n, 78 N.J. at 79-80, 393 A.2d 233. See Bethlehem Tp. Bd. of Ed. v. Bethlehem Tp. Ed. Ass'n, 91 N.J. 38, 44, 449 A.2d 1254 (1982).
These general guidelines have led to the recognition that decisions on matters such as compensation, hours, workloads, sick leaves, physical accommodation and grievance procedures are, unless preempted by statute or regulation, mandatorily *116 negotiable. Burlington Cty. Col. Fac. Ass'n v. Bd. of Trustees, 64 N.J. 10, 14, 311 A.2d 733 (1973). See Bd. of Ed. of Woodstown-Pilesgrove v. Woodstown-Pilesgrove Ed. Ass'n, 81 N.J. at 589, 410 A.2d 113. On the other hand, the decisions to hire, retain, promote, transfer, assign and dismiss are not negotiable. Dunellen Bd. of Ed. v. Dunellen Ed. Ass'n, 64 N.J. at 26, 311 A.2d 737. See Teaneck Bd. of Ed. v. Teaneck Teachers Ass'n, 94 N.J. at 16, 462 A.2d 137; State v. State Supervisory Employees Ass'n, 78 N.J. at 94, 393 A.2d 233; Ridgefield Park Ed. Ass'n v. Ridgefield Park Bd. of Ed., 78 N.J. at 156, 393 A.2d 278. Similarly, the fixing of a college calendar or the provision for a college calendar committee, Burlington Cty. Col. Fac. Ass'n v. Bd. of Trustees, 64 N.J. at 16, 311 A.2d 733, and the consolidation of faculty chairmanships or discussions thereof, Dunellen, 64 N.J. at 30, 31-2, 311 A.2d 737, are not mandatorily negotiable. Bethlehem Tp. Bd. of Ed. v. Bethlehem Tp. Ed. Ass'n, 91 N.J. at 49, 449 A.2d 1254; Bernards Tp. Bd. of Ed. v. Bernards Tp. Ed. Ass'n, 79 N.J. 311, 321, 323, 399 A.2d 620 (1979).
Recognition of governmental prerogatives in the balancing analysis that must be conducted where both terms and conditions of employment and such prerogatives are involved, is not a begrudging one. In Bernards Tp. Bd. of Ed. v. Bernards Tp. Ed. Ass'n, 79 N.J. at 321, 399 A.2d 620, for instance, the association sought to negotiate withholding of a salary increment for teachers, a significant term and condition of employment. But the increments were related to the quality and performance of the teachers. And thus while recognizing such increments were a "fundamental" term of employment, the Supreme Court nonetheless found that the decision to withhold an increment concerned the quality of the educational system, outweighing the impact upon a teacher's term of employment. See Bd. of Ed. of Woodstown-Pilesgrove v. Woodstown-Pilesgrove Ed. Ass'n, 81 N.J. at 591-92, 410 A.2d 1131.
The limited scope of collective negotiations in the public sector is, furthermore, reflected by the Supreme Court's rejection *117 of the "permissive" subjects of negotiations that exist in the private sector. Ridgefield Park, 78 N.J. at 162, 393 A.2d 278. In so holding, the Court expressed the following concerns upon the scope of collective negotiations in the public sector:
We are hesitant to find the existence of a permissive category of negotiable matters in public employment labor relations to be implicit in the amended act because such a classification might create serious problems in our democratic system. These potential difficulties should be carefully considered by the Legislature before taking any action expressly to authorize permissive negotiability with respect to all public employees. It is quite clear from our reading of the legislative history of L. 1974, c. 123 that the lawmakers did not purport to sanction the delegation of governmental policy decisions on every matter in any way touching upon the terms and conditions of public employment to the sphere of collective negotiation. We deem it appropriate for this Court to comment on these difficult questions concerning the permissibility of delegating governmental powers to private groups or of entrusting the formulation of governmental policy to an arena where the democratic voice of the electorate cannot be heard. In Tp. of West Windsor v. PERC, 78 N.J. 98 [393 A.2d 255] (1978), we indicated that public employees' special access to government applies only where the government is acting in the capacity of an employer, and not where it is acting in its capacity as public policymaker. A private employer may bargain away as much or as little of its managerial control as it likes. Tp. of West Windsor, supra. However, the very foundation of representative democracy would be endangered if decisions on significant matters of governmental policy were left to the process of collective negotiation, where citizen participation is precluded. This Court would be most reluctant to sanction collective agreement on matters which are essentially managerial in nature, because the true managers are the people. Our democratic system demands that governmental bodies retain their accountability to the citizenry.
Our concern is with the very function of government. Both state and federal doctrines of substantive due process prohibit delegations of governmental policy-making power to private groups where a serious potential for self-serving action is created thereby... To be constitutionally sustainable, a delegation must be narrowly limited, reasonable, and surrounded with stringent safeguards to protect against the possibility of arbitrary or self-serving action detrimental to third parties or the public good generally.
........
Since teachers possess substantial expertise in the education area, negotiations between teachers' associations and boards of education present a situation where an agreement which effectively determines governmental policy on various issues is especially likely. The impropriety of permitting such educational policy matters to be determined in the forum of collective negotiation  just as if they pertained to the terms and conditions of employment  is every bit as strong as it is in other areas of public employment. The interests of teachers do not always coincide with the interests of the students on many *118 important matters of educational policy. Teachers' associations, like any employee organizations, have as their primary responsibility the advancement of the interests of their members. Arbitrators, to whom the resolution of grievances under collective agreements is generally entrusted, are concerned primarily with contractual rights and remedies. Of the relevant actors at the local level, only school boards have a primary responsibility to the public at large, as they have been delegated the responsibility of ensuring that all children receive a thorough and efficient education. These boards are responsible to the local electorate, as well as to the State, and may not make difficult educational policy decisions in a forum from which the public is excluded. Moreover, a multi-year contract covering policy matters would freeze the status quo and prevent a school board from making a flexible, creative response to changed circumstances, which might well preclude its acting in the best interests of the students. [Citations omitted. 78 N.J. 162-65, 393 A.2d 278].
See also Bd. of Ed. of Woodstown-Pilesgrove v. Woodstown-Pilesgrove Ed. Ass'n, 81 N.J. 582, 588 n. 1, 410 A.2d 1131 (1980). Similarly, it has been held the "impact" of managerial prerogative determinations is not negotiable. In re Maywood Bd. of Ed., 168 N.J. Super. 45, 56-58, 401 A.2d 711 (App. Div.), certif. denied 81 N.J. 292, 405 A.2d 836 (1979) (cited with approval in N.J. State College Locals v. State Bd. of Higher Ed., 91 N.J. 18, 32, 449 A.2d 1244 (1982)). Accord Paterson Police PBA v. Paterson, 87 N.J. 78, 91 n. 3, 432 A.2d 847 (1981); Bd. of Ed. of Woodstown-Pilesgrove v. Woodstown-Pilesgrove Ed. Ass'n, 81 N.J. at 590 n. 2, 591, 410 A.2d 1131.
Pertinent to this appeal, we recognize the distinction between "procedural" and "substantive" aspects of managerial prerogatives that has evolved. See State v. State Supervisory Employees Ass'n, 78 N.J. at 90, 393 A.2d 233; Bethlehem Tp. Bd. of Ed. v. Bethlehem Tp. Ed. Ass'n, 91 N.J. at 47, 449 A.2d 1254; N.J. State College Locals v. State Bd. of Higher Ed., 91 N.J. 18, 33, 449 A.2d 1244 (1982); Univ. of Med. v. Am. Ass'n of U. Prof., 223 N.J. Super. 323, 337, 538 A.2d 840 (App.Div. 1988), aff'd o.b., 115 N.J. 29, 556 A.2d 1190 (1989). However, although it has been said that procedural matters are negotiable, we were careful to observe in Univ. of Med: "[t]he line between a substantive and procedural matter is sometimes indistinct and giving a matter a particular label may not resolve the issue." 223 N.J. Super. at 337, 538 A.2d 840.
*119 The deceptive simplicity of labeling as procedural a proposal on a managerial prerogative and the need to closely analyze such label, is reflected in Bethlehem Tp., 91 N.J. 38, 449 A.2d 1254. There various proposals concerning the Board of Education's teacher evaluation process were sought to be negotiated and were described as "procedural." A closer examination of the proposals, however, demonstrated that though they might be characterized as "procedural," they substantially affected the underlying managerial prerogative. The Supreme Court analyzed the proposals thusly:
All of the other union proposals in the Bethlehem case pertained to the same subject matter addressed in these regulations  that of tenured teacher evaluations. As with the dismissal policy proposals, three of these proposals sought to establish a joint committee of teachers and administrators to develop criteria for evaluating teachers. See Proposals A.1, A.2 and A.3 on "Teacher Evaluation." Since this area involves similar sensitive matters of educational policy, these proposals were also considered non-negotiable...
The remaining proposals on "Teacher Evaluation" purported to address the procedural aspects of the evaluation program. Several of these proposals involved the exercise of inherent managerial prerogatives in the determination of governmental policy and were, therefore, not negotiable. See B.1.B. (teachers must be informed at least five days in advance of any classroom visitations for evaluation purposes); B.4.B. (evaluators must be full-time employees of school district and certified in the instructional areas they are evaluating); and B.10.C.(2) (written evaluations shall include a listing of the areas where a teacher requires improvement; areas not repeated in subsequent reports shall be considered remedied). [Citations omitted. 91 N.J. at 49-50, 449 A.2d 1254].
On the other hand, a proposal that would require teachers to be given the name of the person evaluating their classroom performance by a specific date was determined to be negotiable, while a proposal as to who that evaluator should be, was not. Id. at 50, 449 A.2d 1254.
Similarly, though both we and PERC had labeled as procedural and thus negotiable a proposal that an employee applying for reassignment could have on record no more than two such requests, the Supreme Court concluded that while such a provision would impact on the employee's chances for reassignment, "it significantly interferes with the information available to the employer" and "therefore impinges on the ability of the employer to make rational decisions on how best to reassign employees...." *120 In re IFPTF Local 195 v. State, 88 N.J. 393, 418, 443 A.2d 187 (1982). Likewise, a proposal that where the criteria for reassignment exist "requests ... shall be given consideration," though characterized by PERC and us as "a procedural right to be heard," was, on balance, found by the Supreme Court to involve "a duty on the employer which impinges on the substantive reassignment decision." Id. Similarly, in State v. State Supervisory Employees Ass'n, 78 N.J. at 97, 393 A.2d 233, a proposal that would require civil service promotional examinations to be administered within 90 days of the appointment of a provisional employee, albeit procedural in nature, was nonetheless considered non-negotiable because it did not intimately affect employees and did involve a managerial determination, i.e. when to schedule the examination.
The simple labeling of a contract proposal as procedural, thus, does not end the analysis. What is required in each instance is the same type of careful balancing analysis engaged in where a proposal impacts both upon a term and condition of employment and upon a managerial prerogative. As PERC itself has recognized:
[e]ven if a proposal may be labeled procedural, it is still non-negotiable if it significantly interferes with [a managerial prerogative]. State of New Jersey, 15 NJPER 421, 422 (1989).
Our consideration of prior PERC decisions shows this type of discerning analysis of procedural/substantive labels generally has been employed. This is illustrated for example by the determination in Upper Saddle River Bd. of Ed., 14 NJPER 119 (1987) concerning the following proposal for teacher evaluations:
Once a recommendation has been forwarded to the teacher, said teacher may request to the Superintendent, within 10 school days and in writing, the establishment of a date when a meeting would be held with the Superintendent to discuss said recommendation. The superintendent shall not forward the recommendation to the Board without such a conference unless the 10 school days have elapsed without said written request or unless it has become impossible to schedule such a meeting due to absences. Failure in this latter regard shall be grievable. [Id. at 121].
*121 Realizing that the right of a teacher to discuss a recommendation, like the right to receive notice thereof, was procedural, nonetheless PERC held that so much of the proposal as would interfere with the Board's right to choose someone other than the superintendent to present the recommendation was not negotiable. Further, so much of the provision as would restrict the forwarding of the recommendation to the Board without a conference with the teacher was held non-negotiable "because it impermissibly encroaches on the Board's ability to communicate with its superintendent...." 14 NJPER at 122. Similar close analysis in Burlington Cty. College, 15 NJPER 513 (1989), resulted in a determination that a proposal on teacher evaluation "procedures" relating to various aspects of the method and manner of the evaluation process was non-negotiable except insofar as it provided for a date for submission of a faculty "Annual Report", dates for scheduling student evaluations and notice to the faculty member of deficiencies or goals, but any requirement for mutual agreement as to such goals was not negotiable. In the same case a provision that the "home division chairperson" of a faculty member would be responsible for coordinating the evaluation and that "division chairpersons" of other divisions would provide input for the evaluation was held non-negotiable even though that provision ostensibly concerned notice of who the evaluators would be. As PERC observed, "[t]his clause does more than give faculty notice of their evaluators. It limits the Board's ability to decide who will evaluate." 15 NJPER at 517.
Indeed, designation of who performs an evaluation, and the role of such evaluator within the process itself has consistently been held non-negotiable over claims that such provisions are merely procedural. E.g. State of New Jersey, 11 NJPER 497 (1985) (proposal regarding who is to make recommendations regarding promotions held not negotiable); Brookdale Community College, 9 NJPER 560 (1983) (proposal designating individual having primary responsibility for evaluation held non-negotiable); Tenafly Bd. of Ed., 8 NJPER 621, 622 (1982) *122 ("Board has a non-negotiable, managerial prerogative to determine who will prepare the written annual summary evaluations for its teachers," "an employer has the right to designate the person who will evaluate teaching staff members"); New Jersey Institute of Tech., 7 NJPER 461 (1981) (Institute has managerial prerogative to establish special committee to review promotional qualifications of faculty members); Rutgers University, 6 NJPER 546 (1980) ("the composition of a committee which makes recommendations regarding change of rank is a managerial prerogative;" "employer may not be required to negotiate the composition of a body it may choose to create to assist it in making promotional recommendations"); East Orange Bd. of Ed., 6 NJPER 331, 332 (1980); ("the identity of the person responsible for conducting substantive evaluations of tenured as well as non-tenured teaching personnel is not negotiable"); Matawan Regional Bd. of Ed., 6 NJPER 325, 327 (1980) ("provision which delineates restrictions on who will be responsible for conducting substantive evaluations of teaching personnel is not negotiable"); Newark Bd. of Ed., 5 NJPER 283, 285 (1979) ("Board cannot be required to negotiate the composition of a body it may choose to create to assist the Executive Superintendent in making promotional recommendations to the Board"); Rutgers, the State University, 2 NJPER 13, 16 (1976) ("University cannot be required to negotiate the composition of a body created by the University to assist the University's Board of Governors in making these [promotion] decisions. This is completely up to management. If it chooses to share this function at a particular level in the decision-making process with an equal number of AAUP or faculty members, it may do so. However, it is not required to negotiate regarding such matters.")
As the aforequoted language from Rutgers reflects, PERC has consistently pierced claims a proposal does no more than affect notice and input and thus is procedural, when such claims are made in connection with provisions for faculty participation or representation on the various evaluation committees. *123 See Newark Bd. of Ed., 5 NJPER 283, 285 (1979). Similarly, it has held that provisions concerning from whom and in what manner internal communications of information within the evaluative process should occur are non-negotiable. State of New Jersey, 11 NJPER 497, 500 (1985). Furthermore, in Bethlehem Tp. Bd. of Ed., 5 NJPER 290, 294 (1979), aff'd, 177 N.J. Super. 479, 427 A.2d 80 (App.Div. 1981), aff'd, 91 N.J. 38, 449 A.2d 1254 (1982), PERC concluded a proposal relating to an evaluative report and requiring that the report address areas of improvement which, if not set forth in the narrative of the report would be considered remedied, was non-negotiable as impacting substantially upon the evaluation itself, noting "[t]he substance of the evaluations and the implications and conclusions drawn therefrom are for the Board and its evaluators to draw."
The premise of these decisions is the recognition that who is to perform a particular role in an evaluative process, how that role is to be fulfilled and what manner internal evaluative communications occur do impinge significantly upon the actual evaluation determination itself. These are aspects of the process that frame and shape the ultimate outcome. Thus, as did the Supreme Court in Bethlehem, 91 N.J. 38, 449 A.2d 1254, PERC has in these areas pierced the label of "procedure."
Inexplicably, however, it did not do so here. We discern, for instance, little difference in proposals 1G, 1H and 5, 5A, 5B here and the proposals found non-negotiable in the previously cited PERC decisions. 1G for instance designates a faculty member other than the chairperson of the particular department to be the responsible department representative and thus concerns the particular role of an evaluator. Similarly, 1H designates who the particular members of the reading committees should be. Proposals 5, 5A, 5B would delineate and mold what that representative should do in the evaluative process and the manner of the internal communications involved in that process. Involving highly subjective and sensitive considerations, the particular manner by which the evaluators *124 at the different levels discuss internally their perceptions and analysis is critical to the judgmental decision-making that is at the heart of the process.
Further, 5, 5A and 5B would inject into the delicately balanced process an element of advocacy. We think it plain that would significantly alter the process and impact upon the ultimate decision. Whether an evaluative process should or should not be shaped, even in part, by a element of advocacy is a decision intensely managerial in nature. We note in this respect PERC's characterization of this proposal as merely a "meet and discuss" provision. Such contractual provisions are encouraged. See In re IFPTE Local 195 v. State, 88 N.J. 393, 409, 443 A.2d 187 (1982). Cf. Matter of Bd. of Chosen Freeholders, 116 N.J. 322, 337-39, 561 A.2d 597 (1989). But the non-confrontational, information-imparting function of a "meet and discuss" provision has a much different and far less intrusive impingement upon the particular managerial decision-making process involved than does a provision that introduces into that decision-making an element of confrontation and advocacy. And while it might be argued such an element is, nonetheless, beneficial for the overall give and take of the collective negotiations process, we again caution that whether or not a particular proposal is wise or would improve the decision-making process is not a factor that can shape a scope of negotiations determination. In re Byram Tp. Bd. of Ed., 152 N.J. Super. 12, 30, 377 A.2d 745 (App.Div. 1977).
Proposals 8 and 2 strike significantly at the evaluation determination itself. Ostensibly, proposal 8 would simply require the use of a form (already required by the University's Instructions) to set forth the results of the evaluation process at each level. But the proposal would do more: it requires that each candidate be rated under the same criteria and in a consistent manner. As noted in Dept. of Law and Pub. Saf. v. State Troopers NCO Ass'n, 179 N.J. Super. 80, 91, 430 A.2d 931 (App.Div. 1981), a public employer may establish different standards *125 and values as it sees fit. The proposal also mandates the use of a category of rating, "not applicable," for particular circumstances. While uniformity and consistency in evaluation criteria is, most assuredly, desirable, if not actually required as a matter of reasonable administrative action, scope of negotiations determinations do not rest upon the desirability or reasonableness of particular proposals. It is neither PERC's function nor the court's in the context of an appeal involving public sector negotiations to dictate to a public employer how best to implement and perform managerial decision-making functions. If a particular proposal significantly intrudes on such decision-making, it matters not how good the proposal may be. Cf. Wayne Tp. v. AFSCME, Council 52, 220 N.J. Super. 340, 343-44, 532 A.2d 255 (App.Div. 1987). See Teaneck Bd. of Ed. v. Teaneck Teachers Ass'n, 94 N.J. 9, 16-17, 462 A.2d 137 (1983). But see N.J. State College Locals v. State Bd. of Higher Ed., 91 N.J. 18, 28, 449 A.2d 1244 (1982) (where agency/employer regulations affect its employees, arbitrariness, bad faith and rationale for the regulations may be considered).
Proposal 2 similarly impacts directly on the evaluation decision and would substantially alter existing standards applicable to the departmental level. Simply stated, the proposal would change the present standard of a two-third vote to qualify for a positive recommendation to the dean to a majority vote. We think it disingenuous at best for PERC to characterize this proposal as negotiable because it does nothing more than "provide input to the decision makers, but does not affect the promotional criteria on the decision itself." Plainly the requirement that a candidate receive a two-third vote to be recommended for promotion is a promotional criteria. Cf. Dept. of Law and Pub. Saf. v. State Troopers NCO Ass'n, 179 N.J. Super. 80, 91, 92, 430 A.2d 931 (App.Div. 1981) (whether a high score on a promotional list justified promotion is a managerial determination).
*126 On the other hand, proposals 1E, 3, 6A, 6B and 6C are indeed procedural in nature and would not intrude upon the managerial determinations involved. 6A, 6B and 6C, for instance, simply pertain to the giving of reasons for rejecting a candidate. See State v. State Troopers NCO Ass'n, 179 N.J. Super. at 94, 430 A.2d 931. Proposal 1E permits the candidate to provide further information to be included in his or her promotional packet. Cf. Bernards Tp. Bd. of Ed. v. Bernards Tp. Ed. Ass'n, 79 N.J. 311, 325-26, 399 A.2d 620 (1979) (provision for advisory arbitration is negotiable as an additional source of information). And proposal 3 does no more than give the candidate notice of the actual vote. We agree with PERC that negotiations on these proposals would not significantly impact upon the evaluative process or its end result.
Accordingly, we reverse the determination that proposals 1G, 1H, 2, 5, 5A, 5B and 8 are mandatorily negotiable. In all other respects the final determination of PERC is affirmed.